(Decided June 4th, 1862.)

# James Birney *vs.* New York & Washington Printing Telegraph Company.

Where prayers neither point nor refer to the pleadings, the correctness of their being rejected or granted, depends not upon the state of the pleadings, but upon the evidence to which alone they refer.

Even where the proof is all on one side, the finding of the facts must be left to the jury, but this is not necessary where the case is tried upon admissions made at the bar: the jury may discredit the testimony, but cannot find contrary to the agreement of the parties.

It is the privilege of a party to raise any question of law arising out of the facts, and to demand the opinion of the court distinctly upon it; and the opposite party has the equal privilege of asking an opinion upon additional facts, not embraced in the hypothesis of his adversary's prayer, but not of controlling or modifying that hypothesis.

Birney *vs.* New York & Washington Telegraph Company.

Where the court cannot grant the entire prayer, as made, though a portion of it in separate, distinct forms, might have been given, it is not error to reject the whole.

A telegraph company is responsible for any loss or injury, resulting from its neglect and failure to make any effort to transmit a message, which its agent has received for transmission, and been paid the price demanded therefor.

A telegraph company is not a common carrier, but a bailee, performing, through its agents, a work for its employer, according to certain rules and regulations, which, under the law, it has a right to make for its government.

A party sending messages by telegraph, is supposed to know, that the engagements of the company are controlled by such rules and regulations, and, in law, engrafts them in his contract of bailment, and is bound by them.

Rules exempting the company from liability for the *non-transmission* and *non-delivery* of *unrepeated* messages, do not apply to a case where *no effort* is made by the company, or its agents, to put a message on its transit.

APPEAL from the court of Common Pleas.

Action brought, January 8th, 1859, by the appellant against the appellee, for that the defendant is publicly engaged in the business of telegraphing or transmitting messages or despatches from Baltimore to New York, for a price or consideration, and the plaintiff delivered to the defendant, on the 10th of November 1858, at its place of business in Baltimore, a certain message or despatch, to be transmitted on that day to the firm of Drake & Carter, in New York, which the defendant received for that purpose, and the plaintiff paid defendant the amount demanded by it for such service, but the defendant *utterly and wholly neglected*, to send or transmit said message or despatch, whereby the plaintiff has been greatly damaged and injured, and claims $500. *Plea* that the defendant did not enter into the contract alleged; on which issue was joined.

*Exception:* By an agreed statement of facts, read in evidence by the plaintiff, it was admitted that the defendant was an incorporated company, carrying on the business of publicly sending, for hire, messages by telegraph from Baltimore to New York, having places of business in both cities, and lines of

telegraph extending between them; that its authorized agent received from the plaintiff, at its place of business in Baltimore, on the 10th of November 1858, at 9 o'clock A. M., a message to be sent to Drake and Carter, stock-brokers, in New York, and agents of the plaintiff, ordering them to sell for him, on that day, 100 shares of New York Central Railroad stock, then in their possession, and belonging to the plaintiff; that the plaintiff paid the price charged and demanded for forthwith transmitting this message to New York from Baltimore, which the defendant agreed to do, that the defendant forgot and neglected to send said message or despatch, and it has never been sent; that the difference in price for which said stock was selling in New York on the 10th of November 1858, when it would have been sold if said message had been properly transmitted, and the 15th of November, when the plaintiff arrived in New York, and first learned that the defendant had neglected to send said message, and on which day he sold the same, was $2.50 per share, or $250 on said 100 shares, which sum, the plaintiff thus lost by the defendant's neglecting to send said despatch or message.

The defendant proved by Wm. H. Deets, that he was employed in the office of the defendant on the 10th of November 1858, for the purpose of receiving messages for transmission to New York, and received the message in question from the plaintiff, but does not know whether it was written in the office or not. He further proved, (subject to exception,) that certain terms or rules were set up in the front office of the company on the two side walls, and these terms were offered in evidence. Among them is one informing the public that to provide against mistakes in the transmission of messages, every message of consequence ought to be repeated, and giving the rates of charges for repeating and reporting, and then it adds: "The company will not be liable for any loss or damage, that may ensue by reason of any delay or mistakes in the transmission or delivery, or from non-delivery of unrepeated messages, but only engage to use reasonable efforts to secure the services of

competent and reliable employees, so as to have their business transacted in good faith.   Nor will the company be responsible for mistakes in the transmission, nor for delay in the transmission or delivery, nor for non-transmission or non-delivery of any repeated message to any extent beyond ten dollars, unless it be insured," and then the rates of insurance are given. The plaintiff neither paid a repeating or insurance price as named in these terms.   On cross-examination, this witness proved that the message in question was received by him, at a pigeon hole, immediately in front of the door of the office, and that he did not call the plaintiff's attention to the notice or terms aforesaid, and that nothing took place at the time, except the receipt of the message by witness, and payment by plaintiff of the price charged by the defendant.   The plaintiff then offered three prayers.

1st.  "On the written statement of facts, read in evidence to the jury, they must find a verdict for the plaintiffs for the amount admitted therein to have been lost by the plaintiff, by failure of defendant to send plaintiff's dispatch to New York as therein stated."

2nd.  This prayer embodies the first, and adds:—"Unless they further find that there was a printed notice set up in defendant's office, notifying persons sending messages, that an insurance price would be demanded for the purpose of making defendant liable for the non-transmission of a message, and also find that the contents of said notice were known to the plaintiff."

3rd.  This prayer also embodies the first, and adds:—"Even although the jury should find from the evidence, that there was a public notice set up in defendant's office, notifying persons sending messages, that an insurance price would be demanded for the purpose of making the defendant liable for the non-transmission of messages, unless they further find that plaintiff's attention was called thereto by the agent or agents of defendant."

The defendant asked the court to instruct the jury, that the

Birney *vs.* New York & Washington Telegraph Company.

plaintiff is not entitled to recover if they shall believe from the testimony, that the notice read in evidence, viz: that the New York and Washington Telegraph Company would not be responsible for mistakes in the transmission, nor for delay in the transmission or delivery, nor for non-transmission or non delivery of unrepeated messages, was prominently and conspicuously displayed in the office of said company, so that the plaintiff in this action, or his agent, saw, or might have seen, the same, and that the said notice contained the terms on which the said company receive and transmit the same, and shall further believe that the message in this case was neither repeated nor insured.

The court, (MARSHALL, J.,) granted the defendant's prayer, and refused those of the plaintiff, and to this ruling the plaintiff excepted, and the verdict and judgment being against him, appealed.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*Benj. F. Horwitz,* for the appellant.

1st. By the agreed statement of facts it is admitted, that a specific legal contract, (independent of the terms or rules set up in the defendant's office,) for the performance of a particular act by the defendant, was entered into between the parties; that the plaintiff paid the defendant the consideration demanded for such performance; that the defendant entirely failed to comply with its contract, and that by reason of such gross negligence the plaintiff lost the sum of $250. If there were no other facts in the case, there could be but one opinion as to the right of the plaintiff to recover the sum, admitted to have been so lost, and the statement of such a proposition is all that can be required by a legal mind. The defendant, however, seeks to avoid the responsibility arising from this special contract, by proving that certain terms, or rules, were set up on the two side walls of its office, though it is not pretended the plaintiff had

44    v.18

any *notice,* whatever, of these terms or rules. It is submitted, that this cannot be law. The only persons who have sought to avoid responsibility by means of a notice, of a *general notice* of this kind, are common carriers, whose duties and obligations are, in many respects, and especially in their public nature, similar to those of telegraph companies, but the *most liberal* of the cases, as to the law in reference to them, establish, and very properly too, the rule, that unless such notice be brought home to the knowledge of the employer, (which is *indispensably* necessary in order to render it available,) his consent to its terms cannot be *implied,* and even then in case of wilful misconduct or gross negligence, the carrier cannot limit his responsibility for the damage occasioned thereby. *Smith's Merc. Law,* 339 to 341. 19 *Wend.,* 251, *Cole vs. Goodwin.* 10 *Ohio,* 145, *Jones vs. Voorhees.* 6 *Maule & Selw.,* 150, *Kerr vs. Willan.* 4 *Mees. & Wels.,* 749, *Palmer vs. Grand Junction Railway.* Almost the same rules have been applied to the responsibility of telegraph companies. 35 *Penn. State Rep.,* 298, *Dryburg's case.* 15 *Grattan,* 122, 130, 143, 148, *Hobson's case.* The Act of 1852, ch. 369, does not apply to this company, because it was not incorporated under the laws of this State; and a corporation could not pass, as a by-law, such regulations as are comprised in the terms or rules appearing in this case. *Angell & Ames on Corp.,* 337. The plaintiff's prayers should, therefore, have been granted.

2nd. The defendant's prayer should have been rejected, not only for the reasons above stated, but for other reasons also:— it requires the jury to find facts of which there is no evidence whatever, and is bad in form.

3rd. Even if the telegraph company could avoid responsibility by reason of the terms or rules offered in evidence, it must show a compliance with them, which is not done, but the contrary is shown, by the evidence. But besides all this, the terms or rules, themselves, do not cover this case at all. They only apply to cases of delay or mistakes, in the transmission or delivery, or the non-delivery of unrepeated messages, and to

repeated messages not insured. This is not such a case, but is a case where the company receives pay for transmitting a message, and makes *no effort*, whatever, to put it upon its transit. The rules, in question, do not cover it at all.

*C. J. M. Gwinn*, for the appellee.

The appellant's prayers were erroneous for various reasons, apart from the real questions of law arising in the case. They were defective, because they claimed *special* damages arising from the neglect of the appellee in the transmission of the despatch when no such *special damages* were specifically laid in the declaration, as they ought to have been, (*Chitty on Carriers*, 216; 1 *H. Bl. Rep.*, 299, *(note,) Hutton vs. Bolton; 8 G. & J.*, 314, *Dandridge's Case; 2 Md. Rep.*, 136, *Ellicott vs. Lamborne; 13 Md. Rep.*, 439, *McTavish vs. Carroll;* and same case in 17 *Md. Rep.*, 1; *Act of* 1856, *ch.* 112, *sec.* 34,*)* for *non constat,* that the neglect of the company to send the despatch, was any necessary occasion of damage. All these prayers also assert that, "on the written statement of facts read in evidence, the jury *must* find," &c., the effect of which is to deprive the jury of their undoubted privilege of deciding upon the truth of the evidence. 1 *Md. Rep.*, 451, *Grove vs. Brien.* 11 *G. & J.*, 489, *Ragan vs. Gaither.* 2 *Gill*, 426, *Corner's Case.* An agreed statement of facts cannot present a different case from uncontradicted testimony; different decisions seem to have been made in *Armstrong vs. Risteau*, 5 *Md. Rep.*, 276, and in *Inloes' Case*, 11 *Md. Rep.*, 184, but it appears to me, that in those cases the court have applied a principle which properly belongs to admissions in *pleading*, only, to admissions at bar of facts, which must still be passed on by a jury, because of the nature of the *issue:*—admissions in *pleading* remove the facts admitted from the consideration of the jury, whilst admissions at bar do not. But again, the first prayer is bad, because it could not be granted unless the court assumed the non-existence of all other testimony given in the cause, for by this prayer, no part of it is submitted to

the finding of the jury:—it ignores every.part of the testimony. offered by the appellee. 2 *Gill,* 162, *Byer vs. Etnyre.* The second and third prayers are also bad, because the legal question, involved in the case, is not whether "the plaintiff's attention was called" by the agent of the defendant to a public notice set up in the office, in relation to the necessity of insuring messages, for the purpose of making the defendant liable for their non-transmission, but it is whether the plaintiff *knew*, or *was in law bound to know*, the rule in question.

The questions which the prayers of the plaintiff failed to raise, are presented by that of the defendant, and the whole question open to consideration can be discussed in the examination of the law of that instruction.

This company is an incorporated company, doing business in this State, and by the Act of 1852, ch. 369, sec. 10, it is made the "duty of the owner, or the association, owning any telegraph line, *doing business within this State*, to receive" despatches for transmission, "*as established by the rules and regulations of such telegraph line*, to transmit the same, with impartiality and good faith, under a penalty of $100 for every neglect or refusal so to do, to be recovered in the name of the person sending, or desiring to send, such despatches." Now, whilst it is made the duty of the company to receive and transmit messages, it is, by the terms of this general public law, provided, that this duty shall be performed in the manner "*established by the rules and regulations of such telegraph line*," which, in this respect, is more favorable to such companies than the English Act of 16 & 17 *Vic.*, ch. 263, sec. 66, which allows them to make "*reasonable* regulations" only. This Act, by force of its terms, incorporates the rules and regulations of the company into any contract raised by implication of law, from the mere act of giving and receiving a message for transmission, when there has been no express agreement to dispense with, and vary, such rules and regulations. A party dealing with the corporation is bound by these rules and regulations, thus forming a part of his contract:—he is

bound to know their rules, and to ascertain for himself, whether the agents, by whom alone a corporation can act, was authorized to make the contract on which here lies;—he is bound to ascertain for himself, the extent of the authority conferred upon such agents.

But the appellant attempts to assimilate this case to that of a common carrier, and to maintain that the defendant was subject to a legal responsibility which it had no power to modify, except by an express notice brought home to the parties dealing with it. I shall attempt to establish, upon principle, that a telegraph company is not a common carrier, and therefore, is not put to the necessity of making what may amount to a special contract, in order to modify any common law liability, as an *insurer*. I enter at this point upon new ground, which the case requires should be explored.

We adopt the proper definition of a common carrier, when we select the text and citations of *Chitty on Carriers*, 15. He is one who, by ancient law, held, as it were, a public office, and was bound to the public. To render a person liable as a common carrier, he must exercise the business of carrying as a public employment, and must undertake to carry *goods* for all persons indiscriminately. He is a person that carries *goods* for hire. *Jacob's Law Dict., tit., Carrier.* The custom of the realm created his employment, and fixed his responsibility. Since he was in charge of the goods from the moment he received them until the end of their journey, that custom made him responsible for them in every event, against which individual care and foresight could guard. *Jones on Bailments,* 104. He was left with but two excuses, which would avail him in case of loss. Where the misfortune occurred by the act of God, or through the enemies of the State, he was exempt; but in no other case. The reason of this responsibility, founded on the impossibility of otherwise holding the carrier to strict account, is clear enough; and the result of the rule is, practically, to make the carrier an *insurer* against every injury

or loss, except such as is occasioned by the act of God, or of the enemies of the State. But we repeat, that no employment comes within the definition of a common carrier, *according to the custom of the realm*, except where that employment is concerned in the transportation of *goods*. *Chitty on Carriers*, 243, 306.

The inquiry here is, whether a telegraph company is a common carrier, according to the custom of the realm; that is to say, does it carry *goods*, and is it an *insurer*, from the nature of its occupation? These are tests which will enable us to discover whether the defendant is a common carrier, or not. We settle these questions, however, when we dispose of the first. It was because, of the fact that goods *were in his sole custody, and were subject to his single superintending care, from the moment they were received to the moment the terminus of the journey was reached,* that the custom of the realm, and the common law, made the carrier responsible for them in every event, except those against which individual vigilance could not guard. It was because, in its contemplation, only the providence of God, and the acts of the enemies of the State, were events beyond the control of the carrier, that he was held responsible for all losses proceeding from other sources to the goods in his charge, and was for this reason *practically* an insurer. But his whole obligation was one founded on the actual and manual possession of the *goods* of the person employing him. Nor was the rule an unreasonable one, when we know that the carrier who received goods, was able to measure, by his knowledge of their character and value, the terms upon which he would undertake to carry them, and also the precise measure of diligence which was needful to their safety.

Now we ask, whether the duty which a telegraph company has to perform, ranges itself under any such description, or is capable of enjoying any such safeguard in its exercise? In the first place, it agrees to carry no *goods*, nor anything that can be so described by the greatest stretch of legal ingenuity.

What does a telegraph company do? It receives a written message for transmission. It uses machinery to reproduce the words of that message at a distant point, either by direct copying of the message under some alphabetical system, or by translating that message into certain symbols, which, marked upon paper at a distant point, are there translated into our ordinary language. Can it be said to be even in the manual charge of the message so transmitted, during its transmission? Not so. It relies confessedly on machinery and upon threads of communication, which stretch hundreds of miles, and are liable at each fraction of an inch to break, or interruption, through accident, influence of climate, wantonness or malice. These circumstances make it impossible for the company to remain in actual practical custody and observation of its line. The idea of annexing to such machinery and to such modes of communication, the office of a common carrier, and requiring its proprietors to regard themselves as *insurers* of every message committed to them,—except in cases in which they could *show* that they had failed to transmit a message, because of the providence of God or of the violence of the enemies of the State,—would cast upon them an intolerable burden. The carrier of goods can avail himself of such excuses, *for he sees what happens to his charge at the moment it happens,* by his own vision, or the eyes of his agents. But a telegraph company, owing to the myriad causes which may disturb the security of its lines, would be left as often open to liability because of the providences of God, unknown to it, as because of any other reason.

It is impossible to come to the conclusion that the law casts upon a telegraph company the character of an *insurer.* And since it neither receives goods, for transmission,—nor is an insurer, because of the character of its undertaking as to such goods, we must look elsewhere for the class of bailments, to which its operations ought to be likened. For we may add here, if it be a common carrier, and a message sent by it was defectively delivered, or not delivered, it would be liable, un-

der a declaration properly framed and laying special damage, to all the direct damages arising from such defective delivery, or non-delivery, of the message. But surely, it may be asked, whether any court would hold that a telegraph company was liable for the enormous losses that might be entailed upon it for the non-transmission or defective transmission of a message, in relation to transactions, of the pecuniary importance of which it was not advised by the sender, and of which, perhaps, the abitrary words used as symbols in the message as written, might give it no warning? No such enormous and disproportionate risk is cast upon the carrier of the goods, because the carrier has always the means of apportioning his diligence to his responsibility.

The true character of the bailment made to a telegraph company, is in that class known as the *locatio operis faciendi*. *Story on Bailments*, sec. 370. The telegraph company "does some work, and bestows some care on the thing bailed." 1 *Parsons on Cont.*, 610. It is not an insurer, but comes within the strong and clear language of *Justices Turton, Gould* and *Powys* in the celebrated post office case of *Lane vs. Cotton*, reported in 1 *Salk.*, 17, and 1 *Ld. Raym.*, 646. "Its office is for *intelligence*, not for *insurance*." A telegraph company may, with such knowledge as it has of the condition of its line, *assume* the office of an insurer, if it chooses so to do, for certain considerations; but the *duty* of insurance is not cast on it by the law. *It is not an insurer, except it become so by contract, and, therefore, it is not a carrier.* This telegraph company was not a common carrier, but a bailee, performing, through its agents, a work for its employer, according to certain rules and regulations, which it was authorized to prescribe for its government. It was not a common carrier, because by the Act of 1852, ch. 369, sec. 10, it was authorized to contract, not by force of any common law duty or obligation, but in accordance with its rules and regulations, and this power is inconsistent with the common law definition of a carrier. The employer, who knew, or was supposed in law to

know, that the engagements of the company were subordinated to the rules and regulations thus formally adopted, does himself in law engraft them on his contract of bailment, and is bound by them, if they were rules and regulations which the corporation contracting with him had the right to adopt. Whether the corporation had the right to make such rules and regulations under the law, is of course a question of law. *Angell & Ames on Corp.*, sec. 357. *Commonwealth vs. Worcester*, 3 *Pick.*, 462. *Paxson vs. Sweet*, 1 *Green.*, 196.

The question, therefore, for this court to determine is, whether it was competent for this particular corporation to make the rule, that it would not be responsible for mistakes in the transmission, nor for delay in the transmission or delivery, or non-delivery of any repeated message beyond ten dollars, unless it was *insured*, nor would be responsible for delays to insured messages even when the delay occurred from interruption in working the telegraph?

The court will observe that the *Stat.* 16 & 17, *Vic. ch.* 203, sec. 66, subjects those using the telegraph to such *"reasonable regulations"* as the companies may make. The Act of 1852, ch. 369, imposes no such restraint. But, in the particular employment of the company, we are bound to say, that *the rule which required a message to be repeated or insured, to make the corporation responsible for the negligence even of its agents, is a reasonable rule.* A corporation fulfills its *primary* duty, as to the class of bailments, to which this case belongs, when it employs sufficient machinery, and competent agents, for the transaction of its business. When it has done this, it has done all that it can do *as a corporation;* for, as it is an artificial being, it can only provide means for the performance of its appointed work, and execute that work through its agents. It cannot personally execute or oversee the work done. Now what is the character of the contract between the appellant and the appellee in this action ? We state a fact of science, which we may use in this argument without its appearing of record, when we say the operating apparatus of the telegraph,

leaves no record of the *work done* at the place from which it is transmitted, and that therefore, there is a pecular liability to error in the non-transmission, and transmissions of despatches. So plain is the risk created by this circumstance, that we may assume that is is impossible to *know* with certainty, that a message has been transmitted at all, or transmitted in the very words of the despatch, unless the operator at the other terminus of the stipulated route informs the operator transmitting the despatch, of the fact of its reception, and of the very form in which it has been received. The court will perceive, therefore, that it is not only reasonable that the company should stipulate that it should only be held responsible for messages which were *repeated* from the point to which they are sent, but that in sound reason it seems that such a repetition is necessary to the safe transmission of any despatch. And although it is competent for the company, dealing with those who are supposed to know the nature of the means which they employ, to consent to send unrepeated messages, at a low rate, they are authorized certainly to contract with the party, *who avails himself of this low rate,* that he shall take all the risk of such a proceeding, and become practically his own insurer in the use of the means and agencies which they have provided. For this case does not present the circumstance of a telegraph company seeking to free itself from *all* responsibility for the acts of agents, *but the circumstance of a party agreeing to accept the chance of the negligence of the agent, provided that he is asked a less price for the service, which the company is to perform.* It seems to us that *MacAndrew's Case,* 84 *Eng. C. L. Rep.,* 12, is a clear and definite authority for the position we take. Precisely the same ruling was made in *Camp's Case* in 1858, 6 *Am. Law Register,* 443. Nor is *Dryburg's Case,* 35 *Penn. State Rep.,* 298, to be accepted as the law of this, because in that case the action was brought by the person who *received* the despatch, and not by the person who *sent it.*

GOLDSBOROUGH, J., delivered the opinion of this court.

The action in this case was instituted in the Court of Common Pleas of Baltimore city, by the appellant against the appellee, to recover damages for the total neglect to send, or transmit, a message, or despatch, received by the appellee to be transmitted.

The appellee pleaded, that it did not enter into the contract alleged in plaintiff's declaration, for the transmission of the telegraphic despatch, or message, named therein.

At the trial of the cause an admitted statement of facts, and the evidence offered by the appellee, were submitted to the jury. The appellant then offered three prayers, and the appellee one prayer. The court rejected the prayers of the appellant, and granted the prayer of the appellee; to this ruling of the court the appellant excepted.

In reviewing the action of the court below, it is proper to notice, that the prayers submitted to the court are predicated upon the evidence, without any reference to the pleadings. In such case the rule is, "that where a prayer, or prayers, neither point nor refer to the *pleadings,* the correctness of their being rejected or granted, depends, not upon the state of the *pleadings,* but upon the *evidence,* to which alone they refer." See 1 *Gill,* 227; 7 *Gill,* 5; 1 *Md. Rep.,* 207; 13 *Md. Rep.,* 126.

In view of the above rule, we are next to consider the reasons, assigned by the appellee, why the appellant's prayers were properly rejected. The appellee contends, that "in each of these instructions, it is stated that, *on the written statement of facts, read in evidence, the jury must find,*" &c., and that the effect of this wording of the prayers is, to deprive the jury of their undoubted privilege, of deciding upon the truth of the evidence," and cites 1 *Md. Rep.,* 451, and 11 *G. & J.,* 489. We find a satisfactory answer to this proposition in 11 *Md. Rep.,* 185, in which this court say: "It is well settled, that even where the proof is all on one side, the finding of the facts must be left to the jury; *but this is not necessary when the case is tried upon*

*admissions at the bar.* The jury may discredit the testimony, but cannot find contrary to the agreement of the parties." See, also, the case of *Armstrong vs. Risteau,* 5 *Md. Rep.,* 276.

Again, the appellee contends that the first prayer is bad, "because it could not be granted unless the court assumed the non-existence of all other testimony given in the cause; because by the prayer, no part of it is submitted to the finding of the jury." In our opinion the appellant, in presenting this prayer to the court, only exercised a right recognized by law. In *Whiteford vs. Burckmyer and Adams,* 1 *Gill,* 143, the court say: "We hold it to be the privilege of a party to raise any question of law arising out of the facts of the case, and to demand the opinion of the court distinctly upon it. If the opposite party believes that other facts, not embraced in the hypothesis assumed, are properly calculated to justify an application for other and different instructions, he has the equal privilege of asking an opinion on the additional facts, but not the privilege of controlling and modifying the hypothesis of his antagonist." Here the appellee has brought itself within the above rule, by asking an instruction from the court on other facts not embraced in the prayer of the appellant. It is further contended by the appellee, that it is protected from the demand of the appellant by its rules and regulations, established under the Act of 1852, ch. 369.

By a careful examination of those rules and regulations, we find no provision exempting the appellee from liability in a case of default and neglect, such as is contained in the statement of facts.

It is admitted by the statement of facts, that the appellant delivered the message for transmission, and paid the price demanded for that service; that the person who received it was the authorized agent of the appellee; that the message was received at the appellee's place of business; that the appellee *forgot, and neglected to send said message and despatch, and it has never been sent.* The loss of the appellant in the sale of his stock, is also admitted. We must therefore regard

the appellee as a party contracting to perform a service, within the sphere of its business for compensation, which it fails to perform, and, for such failure, must account for any loss or injury that results from its neglect; and such loss, or injury, will be the measure of damages to which the plaintiff is entitled, whether admitted or found by the jury.

The appellant's first prayer was therefore improperly rejected. The action of the court below, upon the appellant's second and third prayers, we must approve. The rule laid down in 12 *G. & J.*, 236, and 12 *G. & J.*, 484, is directly applicable to these prayesr. The court say: "Where the court cannot grant the entire prayer as made, though a portion of it, in a separate, distinct form, might have been given, it is not error to reject the whole." We think the latter part of the second and third prayers of the appellant obnoxious to this rule. They substantially raise the question, that though the default and neglect, of which the plaintiff complains, may be embraced within the rules and regulations exempting the appellee from liability, yet that liability is not removed unless these rules and regulations are brought home to the knowledge of the appellant. In our opinion, the converse of the proposition is true: the appellant was bound in law to know them.

The appellant's counsel attempted to assimilate the responsibility of this telegraph company to that of a common carrier. But the distinction is obvious. It is well defined by the appellee. "What does a telegraph company do? It receives a written message for transmission. It uses machinery to reproduce the words of that message at a distant point, either by direct copying of it under some alphabetical system, or by translating the message into certain symbols, which, marked upon paper at a distant point, are there translated into our ordinary language. It cannot be said to be even in the manual charge of the message, so transmitted, during its transmission. It relies on machinery and upon threads of communication which are liable to break or interruption, through accident, influence of the climate, wantonness or malice. These cir-

cumstances make it impossible for the company to remain in actual practical custody of its line.''

While a common carrier is an *insurer*, and is protected from liability by the act of God or the enemies of the State, he can avail himself only of such excuses. He sees what happens to his charge at the moment it happens. But a telegraph company, owing to innumerable causes which may disturb the security of its lines, would be as often open to liability because of the providences of God, unknown to it, as because of any other reason.

This telegraph company is not a common carrier, but a bailee performing, through its agents, a work for its employer, according to certain rules and regulations, which, under the law, it has a right to make, for its government. The appellee is supposed to know that the engagements of the appellee are controlled by those rules and regulations, and does himself, in law, engraft them in his contract of bailment and is bound by them.

The appellee cannot be considered a common carrier, because, by the Act of 1852, ch. 369, it was authorized to contract, not by the force of any common law duty or obligation, but in accordance with its rules and regulations, and this power is inconsistent with the common law definition of a carrier.

The prayer of the appellee was erroneously granted. Conceding that the notice, read in evidence, contained the terms on which the appellee would receive and transmit messages, and its exemption from liability, as stated in the prayer; and, also, that this notice was displayed in the office of the company, so that the appellant saw or might have seen it; still it is manifest that the terms of the notice neither embrace nor declare an exemption from liability in a case where *no effort* is made by the company, or its agents, to put a message on its transit. The exemption from liability for the non-transmission and non-delivery of unrepeated messages, provided for by the rules contained in the notice, does not, in our opinion, in any way embrace or affect this case.

Merchants & Miners Transportation Co. *vs.* Mayor & C. C. of Balt.

The terms of the notice in which exemption from liability is declared, clearly imply an obligation on the part of the company to attempt the transmission and delivery of a message received by it for that purpose, and it would be most unreasonable to permit it to have the benefit of an exemption from liability without first bringing itself within the scope of the exemption provided for, by a full and faithful performance of its implied duties.

While we give full force and effect to the rules and regulations of the appellee in a legal construction of them, we deem it unjust to the appellant to extend that effect beyond the *actual terms* adopted by the appellee to secure its exemption.

*Judgment reversed, and procedendo awarded.*

(Decided June 4th, 1862.)