# CLARA GREER

## vs.

# THE WESTERN UNION TELEGRAPH COMPANY.

*Telegraph Company—Transmission of Money—Negligence of Other Company—Conditions of Contract.*

In an action against a telegraph company for the non-delivery of money transmitted by telegraph, *held* that the evidence sufficiently showed that the "transfer order," signed by plaintiff when sending the money, though afterwards lost, was before her and her attorney when they met at defendant's office to inquire as to the matter, and that such order contained provisions, limiting defendant's liability, similar to those in-the blank form ordinarily in use in its office at that time.          p. 672

In an action for the non-delivery of money transmitted by telegraph, an employee of defendant company could properly testify, the original transfer order having been lost, that the form of such an order, introduced in evidence, was the prevailing form and that no other had ever been used.   pp. 670, 672

In an action for non-delivery of money sent by telegraph, *held* that there was no negligence on the part of defendant company, to whom plaintiff delivered the money for transmission, it being affirmatively proven, without any attempt at contradiction, that defendant sent the money to the end of its own lines, that it was received there with proper instructions, and forwarded from there.          p. 673

Under Act of Congress of June 18, 1910, and even apart from that legislation, a telegraph company, receiving a message for transmission, may limit its liability to defaults occurring on its own line.          pp. 676-679

One sending a telegraph message is bound to know the rules and regulations of the company, which are engrafted in his contract, and this is the case irrespective of whether the dispatch offered for transmission is expressly declared to be subject to these terms and conditions.          pp. 675, 676

A telegraph operator, in the absence of special authority proven, or some statute, has no power to abandon restrictions imposed by the company as regards its responsibility for defaults beyond its own lines.                                   p. 676

*Decided June 26th, 1923.*

Appeal from the Superior Court of Baltimore City (FRANK, J.).

Action by Clara Greer against The Western Union Telegraph Company. From a judgment for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, and OFFUTT, JJ.

*William Deal Roycroft,* for the appellant.

*W. Irvine Cross,* with whom was *Francis Raymond Stark* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The plaintiff (appellant) on the 13th of December, 1915, obtained from the defendant (appellee) at its Baltimore office a foreign money transfer order for the sum of $175, payable to her husband, John Greer, who was at Newcastle, New South Wales, Australia, and paid the appellee $14.30 for it, in addition to the amount of the order. The appellee gave the appellant a receipt for the amount which reads as follows:

"Baltimore, Md., Dec. 13, 1915.

"Received of Clara Greer one hundred and seventy-five dollars ($175.00) to be paid to John Greer at Newcastle, New South Wales, Australia, subject to the terms and conditions of transfer order of this date.

"J. M. McLean, T. A. Manager."
"Charges paid, $14.30."

She found that her husband had not received the money, went to the office of the defendant to ascertain why he had not received it, and about two weeks afterwards an agent sent for her to come to the office and identify a receipt. Upon looking at it she found that it was not her husband's handwriting and that it was signed "John Green," instead of "John Greer." She inquired about it from time to time and about six months afterwards was told that "they," referring to the company's agents, had not heard anything about it, but that another man had got the money. About two months later she was told at the office that a man named Green got it, that he had gone off to the war, used some, and returned some of the money.

She said she read the receipt and saw on it the words, "carried to Newcastle subject to the terms and conditions of the transfer order of this date"—that the transfer order was dated December 13, 1915, the day she signed it. In some way the original transfer money order, or application, as it is also spoken of, was lost or mislaid before the trial. On the stand she was shown a blank order and said it did not look like that—was a little wider, and not quite that long; that "it was like a money order blank where you are supposed to sign your name and the one you were sending to and where it was to go. That is all I can remember what was on it, I remember 'pay to the order of.'" She was asked about the conditions on it which will be seen later, and said she did not see them. Later she said, "I never saw that paper I signed again: about a year afterwards they showed me a paper there once that they said I signed. I did not read it."

John Alexander Greer, the husband, testified that he never received the money and described the efforts he had made to find it, that he was informed in Newcastle that a man by the name of Green had received it.

The defendant read to the jury the deposition of M. P. Martin, who testified that he lived in San Francisco, and said, "I am telegraphic man in the Anglo, London, Paris

National Bank, exchange departments and cable in the business of transferring money orders by telegraph; that was my position on December 13, 1915. I remember, and my records show a receipt from the Western Union Telegraph Company on said 13th day of December, 1915, a telegraph money transfer for one hundred and seventy-five dollars from Baltimore, Maryland, to John Greer, care of David Baker, Newcastle, New South Wales, Australia. I received that money order on the 13th day of December, 1915. I forwarded it on the same day to the Union Bank of Australia at Sydney, New South Wales, Australia, by telegraphic cable." He said they had no correspondent at that time at Newcastle, and the nearest one was the Union Bank of Australia at Sydney; that there was no method of sending money directly by cable to Newcastle, the Union Bank would remit by telegraph under receipt from them; that they gave a receipt to the Western Union for $175. "It was paid to our bank to be cabled to John Greer at Newcastle, New South Wales. We sent a cable to New South Wales directing the payment of this money received from the Western Union; that was December 13th, 1915, by Postal Telegraph and Cable Company. The company owning the cable is the Commercial Pacific Cable Company; its lines extend from San Francisco, California, to Sydney, Australia. The cable message was sent to Union Bank of Australia at Sydney; the message filed by me with the Postal Telegraph Company at San Francisco, California, directed the payment of the" money received from the Western Union to John Greer at Newcastle. He said he did not have the original message, as that is held by the Postal Telegraph Company, but it directed the payment of the money to John Greer and not John Green; that he was informed by the Postal Telegraph Company that it was sent correctly in the name of "Greer" but in some way the name was changed to "Green" when the message reached Sydney; that he was instructed to send the money to John Greer. He further said that his bank had recovered twelve pounds,

two shillings and eight pence, which was paid by mistake to John Green, and it was now holding that draft for the Western Union from whom they received it.

Victor J. Albert, manager of the Western Union business in Baltimore, explained the method employed in sending money from one telegraph office to another. He said: "The transfer order is the order of the payee on the telegraph company to pay money. It is the application blank. The form that you hand me was in use in our company in 1915. I am not sure that our office has the identical paper that was signed by this lady. If we have not that identical form it was turned over to you, or it appears to me that that was mislaid or something. I am not sure."

The form spoken of is as follows:

"Form 572-A.
"The Western Union Telegraph Company of Baltimore City.
"Newcomb Carlton, President.
"Foreign Money Transfer Order.

"No.....                      ............., 191....

"The Western Union Telegraph Company of Baltimore City, subject to the conditions below, pay to ..............the foreign equivalent of the sum of ........dollars at the rate of exchange established by ·the company or its foreign agents, for transfers of the similar amount on the date of this transfer.

"When the company has no office at destination authorized to pay money, it should not be liable for any default beyond its own lines, but shall be the agent of the sender, without liability, and without further notice, to contract on the sender's behalf with any other telegraph or cable line, bank or other medium, for the further transmission and final payment of this order."

He was then asked about the loss of the paper and whether it had been searched for and said, "Oh, yes, our office looked for it at that time; there was no different form. I have entire charge of the offices here in Baltimore, the employment

of people, the purchase of everything. I think I saw the
paper that Mrs. Greer did sign. After the claim was made,
the papers were brought—an investigation was made, and the
result of the investigation was given to the complainant. As
I recollect it, the complainant's attorney took the matter up,
and it was—the whole matter was gone over, and the result
of the investigation was given to him. At that time the orig-
inal application form, which was the prevailing form, and no
other having been used." At that point the plaintiff ob-
jected and moved to strike out the words, "which was the pre-
vailing form and no other having been used." That motion
was overruled and the ruling was presented by the first bill
of exceptions.

The witness continued his direct testimony as follows:
"At that time I reviewed it with the attorney; Mrs. Greer
was not there," and upon being told to tell the jury whether
that paper was the same as the one that had just been sub-
mitted, he answered: "It was the same." That was objected
to but admitted, and the ruling constitutes the second bill of
exceptions. He then said: "It contained that agreement";
that the Western Union has no line to Newcastle and had
none in 1915. He then explained the method of sending a
message and said that a money transfer would be handled on
the same basis; that "it would be transmitted over the West-
ern Union lines to San Francisco, where they terminate. At
that point they would use the most available carrier that they
could find to reach New South Wales, some other company
which operated between San Francisco and New South
Wales," etc.

The court requested the attorney for the defendant to in-
quire more in detail as to what efforts had been made to find
the original of the application, which it was said was signed
by Mrs. Greer. He asked the witness to tell the court and
jury what efforts had been made and the witness replied:
"Our own file, complaint case file, was searched in every
particular. The papers had passed between Baltimore and

San Francisco on two or three occasions. San Francisco was asked to find—to make a search. The auditor's office was asked to make a search. The money transfer—general money transfers office was asked to make a search. All places that we had the least idea that this message could have gotten—" At that point the witness was interrupted by counsel for the plaintiff, but he went on to say that he directed the search to be made and they were unable to find it. Finally, with the consent of the plaintiff's attorney, the witness was asked, "Didn't this get into your auditor's office?" and answered, "The application form would go—has to go to the auditor's office for auditing. That is the way they check up the money that comes into this office." And he said that the last time he saw the paper he talked with the attorney for the plaintiff at the office of defendant in Baltimore, and the only information he had is that the paper became lost and he requested the search to be made through the various channels; that he knew from his own personal knowledge that it went to the auditor's office in New York City, and the court then said he thought the evidence was sufficient. On cross-examination, the witness said that he could not be certain whether the plaintiff came to his office with her attorney; that the form offered in evidence was in use in 1915; that the Western Union collected the entire charges of $14.30, and that he was not present when Mrs. Greer sent the money.

The defendant called Mr. Roycroft, the attorney for the plaintiff. He said that he went to the Western Union office about the money with Mrs. Greer and Mr. Albert talked with him about the matter; that some one in the office handed him a paper and said "Show it to Mrs. Greer," and "I took the paper and showed it to Mrs. Greer. I believe that I showed her her signature." He was asked if she denied her signature, and answered, "She said, to the best of my knowledge, 'This looks like it, but it is not the paper that I signed.'" Again he was asked: "Didn't she admit her own signature at that meeting?" and answered, "To the best of my knowl-

edge, Mr. Cross—it has been seven years ago, about six years ago—she said, 'This looks like the paper, looks like the paper.' I think that is what she said." He did not say that Mrs. Greer denied her signature, but she gave the impression that it was not the paper. On being further questioned, this appears in his testimony:

"Q. I do not want impressions. I want to know what she said? A. I cannot say that she emphatically denied it was the paper, but she said the paper looked somewhat different from the one she signed. In other words, there seemed to be some doubt in her mind whether the paper then shown her was the same paper which she had signed. Q. That paper which Mr. Albert testified is the paper that she had signed had in it this agreement that I have read to the court and the jury, didn't it? A. The paper which Mr. Albert handed to me had that statement in it."

When the testimony of Mr. Albert and Mr. Roycroft are taken together, there would seem to be no real doubt that the paper signed by her was before her and her attorney when they met at the Western Union office, and it contained the provisions which were in the copy offered. There was no reversible error in the first or second exceptions. The statement in the first is not objectionable, and the second exception is still less so, as the witness afterwards stated, without objection, that the paper, claimed to be lost or mislaid, contained the agreement. Moreover, there was no exception taken when the copy was finally admitted, and as the important question is in reference to the effect of the agreement, or conditions, we will consider that without further reference to the first and second exceptions.

The defendant's first prayer, which was granted, after being excepted to generally and specially, was as follows: "The court instructs the jury that there has been no evidence offered legally sufficient to prove that the defendant company entered into any special contract to be liable for negligence on connecting lines, and the uncontradicted testimony shows

that there was no negligence on the part of said defendant company in transmitting the plaintiff's money over its lines and delivering the same to the next connecting telegraph company on its way to destination and their verdict must, therefore, be for the defendant."

As the granting of that prayer took the case from the jury, it presents the most important question to be considered. If that was correctly granted, the plaintiff's prayers were, of course, properly rejected, as the first one concluded by telling the jury that if they further found that the non-delivery of the money was either due to the negligence of the defendant, its servants, agents or employees, or due to the person or company to which it turned over the money for delivery, the verdict must be for the plaintiff; the second was on the theory that if the defendant collected the full amount of toll or charges for all lines over which the money would pass ($14.30) and the defendant would, or did, account with the connecting line for its proportion of tolls received, then defendant could not avail itself of the negligence of the connecting company to defeat the right of recovery by plaintiff, and the third was to the effect that if the attention of the plaintiff was not directed to the stipulations and the plaintiff had no knowledge of them, they could not prevent recovery. As the fourth was on the measure of damages, it was unnecessary, if the case was properly taken from the jury.

A good deal of the brief of the appellant is devoted to the point that it was contrary to public policy to allow the appellee company to exempt itself from its own negligence, but we do not understand that question to be actually involved in this case. There is no evidence of any negligence on the part of the appellee—on the contrary it was affirmatively proven, without any attempt at contradiction, that the defendant did send the money to the end of its lines, that it was received there with proper instructions, and forwarded by the bank at San Francisco. Whatever negligence there was, was after the telegram reached Australia. The real question is whether the

appellee was responsible for the negligence of others after the order reached the end of its lines and was forwarded by the bank in San Francisco.

There was considerable difference between the authorities as to the standing of telegraph companies at common law. 26 *R. C. L.* 487-489.   Although the case of *Birney* v. *New York & Wash. Tel. Co.,* 18 Md. 341, has been criticized by some authorities, it was said by our predecessors, on page 358, that "this telegraph company is not a common carrier, but a bailee, performing, through its agents, a work for its employer, according to certain rules and regulations, which, under the law, it has a right to make for its government. The appellant is supposed to know that the engagements of the appellee are controlled by those rules and regulations, and does himself, in law, engraft them in his contract of bailment and is bound by them." In the text of the original edition the word "appellee" is used where we have written "appellant" but that has been corrected in *Perkins'* edition, in *Gildersleeve's* case hereafter referred to, and in the syllabus in *Birney's* case.

While it was said by the Supreme Court in *Primrose* v. *Western Union Tel. Co.,* 154 U. S. 1, that telegraph companies are not bailees, it was distinctly held that they were not common carriers.   But, regardless of the question as to whether they were bailees, prior to any statutes passed on the subject, the case of *U. S. Tel. Co.* v. *Gildersleeve,* 29 Md. 232, has not only been accepted for many years as a leading case of this State, but has frequently been cited by other courts, including the Supreme Court, in the opinion of MR. JUSTICE GRAY in the *Primrose* case, *supra*.   JUDGE ALVEY said in the *Gildersleeve* case, on page 246: "The appellant had a clear right to protect itself against extraordinary risk and liability by such rules and regulations as might be required for the purpose.   It would be manifestly unreasonable to hold these telegraph companies liable for every mistake, miscarriage, or accidental delay that may occur in the opera-

tion of their lines. * * *  In this State, by article 26, section
117 of the Code, while impartiality and good faith are to be
observed, the dispatches are to be received and transmitted
under such rules and regulations as may be established by the
companies, * * * and the appellant having adopted rules and
regulations as authorized by law, according to the decision of
this Court in *Birney* v. *N. Y. & Wash. Tel. Co.,* 18 Md. 341,
the appellee was bound to know that the engagements of the
company were controlled by them and did himself, in law,
engraft them in his contract, and is bound by them.   This
would be the case, whether the dispatch offered for transmis-
sion be expressly declared to be subject to the terms and con-
ditions prescribed or not.   Those dealing with the company
must be supposed to know its rules and regulations, and their
contract must be taken to have reference to them, unless
otherwise provided by special contract."

The reference by JUDGE ALVEY to the Code in the above
quotation referred to the one of 1860, but that was in sub-
stance continued in the Code of 1888, art. 23, sec. 228, and
in the Annotated Code of 1912, section 363 of article 23.
In considering the extent that the company could claim to be
relieved from liability under terms and conditions incorpo-
rated into the contract, he said:   "The appellant could not,
by rules and regulations of its own making, protect itself
against liability for the consequences of its own wilful mis-
conduct, or gross negligence, or any conduct inconsistent with
good faith; nor has it attempted, by its rules and regulations,
to afford itself such exemption.   It was bound to use due
diligence, but not to use extraordinary care and precaution."

In passing, it may be well to refer to the evidence of the
plaintiff, where she said, "He (the agent) told me his com-
pany would send it to Australia.   He did not call my atten-
tion to any conditions about sending that money to Australia,
if he had, I would not have sent it, if he told me they could
not send it," and that it would take about two, no longer than
three, days to go.   It could scarcely be contended that she was

led to believe from the statements made that the Western Union would send the message on its own lines to Australia, as it had no line there, and if she so understood, she certainly misunderstood what was said, but she knew, or was presumed to know, that no telegraph operator could bind the company by such a statement, if he made it, as she seems to have understood it—especially in the face of the regulations on the transfer order.

She admitted that she read the receipt where it was to be carried to Newcastle, subject to the terms and conditions of the transfer order. The exact language she used in her testimony was not, in fact, in her receipt, but the important part was, and, as said in *Birney's* case and *Gildersleeve's* case, *supra,* she was bound to know the rules and regulations engrafted in her contract. "This would be the case, whether the dispatch offered for transmission, be expressly declared to be subject to the terms and conditions prescribed or not." But, beyond that, no telegraph operator would ordinarily have any power to abandon such restrictions and make a new contract, unless expressly authorized to do so, of which there is not a particle of evidence in this case. Even in the case of a recognized common carrier, it could not be done. "A local railroad station agent has no power to make a special agreement extending the liability of his company beyond its own lines, unless it has ben expressly conferred upon him or may be implied from the course of business." *Hoffman* v. *Cumberland Valley Ry. Co.,* 85 Md. 391, 395; *New York & Balto. Transp. Co.* v. *Baer,* 118 Md. 73, 89. Of course, in saying that in reference to common carriers, we do not overlook the changes made by the Hepburn act or the Carmack amendment in reference to initial carriers, but refer to the liability at common law, and cite the cases, although perhaps unnecessarily, as applying to the evidence, to show that such an agent as a telegraph operator would not, in the absence of special authority proven, or some statute, have the power so to bind his employer.

As will be seen by reference to 26 *R. C. L.* 570, 571, and notes, we are in line with a great many other courts, including the Supreme Court of the United States, in reference to a rule of telegraph companies requiring messages to be repeated in order to guard against mistakes in transmitting them, although the author says the great weight of authority is that if a telegraph company seeks to relieve itself from liability for its negligence, such a stipulation is against public policy and void. It is unnecessary, however, to discuss that question, as we have already said there is no evidence of negligence on the part of the defendant, and what JUDGE ALVEY said in *Gildersleeve's* case is sufficient for present purposes; and on page 576 of 26 *R. C. L.* it is said: "A telegraph company receiving a message for transmission over its own line and which becomes the agent of the sender to forward it over the line of another company may, by special contract with the sender, limit its liability to defaults occurring on its own line, and protect itself against any loss occasioned by the negligence of a connecting company."

But it was perhaps useless to discuss the above question at as great length as we have done, as the Act of Congress of June 18, 1910, and the decisions of the Supreme Court, have done away with some of the distinctions made by the courts in this country in reference to such a stipulation in telegraph blanks, limiting the liability of the company unless the message is repeated, in dealing with interstate messages. 26 *R. C. L.* 573. In *Western Union Tel. Co.* v. *Lee,* 174 Ky. 210, Ann. Cas. 1918 C, 1026, many cases are cited, and in the note on page 1033 of Ann. Cas. a great many decisions are referred to. The question has been settled by the Supreme Court since the Act of 1910 was passed. In *Postal Tel. and C. Co.* v. *Warren-Godwin L. Co.,* 251 U. S. 27, 64 L. Ed. 118, MR. CHIEF JUSTICE WHITE delivered the opinion and, for brevity's sake, we will take the liberty of quoting from the syllabus:

"Congress has so far occupied the entire field of the interstate business of telegraph companies by enacting the provi-

sions of the Act of June 18th, 1910, respecting interstate telegraph rates, as to exclude state action invalidating a contract limiting the liability of a telegraph company for error in sending an unrepeated message to the refunding of the price paid for the transmission of the message."

He quoted from *Primrose* v. *Western Union Tel. Co.*, 154 U. S., *supra*, that "It was held that such a contract was not one exempting the company from liability for its negligence, but was merely a reasonable condition appropriately adjusting the charge for the service rendered to the duty and responsibility exacted for its performance. Such a contract was therefore decided to be valid, and the right to recover for error in transmitting a message which was sent subject to it was accordingly limited." In *Western Union Tel. Co.* v. *Boegli,* 251 U. S. 315 MR. CHIEF JUSTICE WHITE again delivered the opinion and said: "The proposition that the Act of 1910 must be narrowly construed so as to preserve the reserved power of the state over the subject in hand, although it is admitted that that power is in its nature Federal, and may be exercised by the State only because of non-action by Congress, is obviously too conflicting and unsound to require further notice."

Of course the rates of telegraph companies as applicable to interstate commerce must be filed with the Interstate Commerce Commission. In *Western Union Tel. Co.* v. *Esteve Bros.,* 256 U. S. 566, 571, the Court said: "The Act of 1910 introduced a new principle into the legal relations of telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company.

It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before, a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect."

The Act of Congress of 1910 provides that "messages by telegraph, telephone or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letters, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages," etc. As such a case as this is subject to the act of Congress, and even before that was passed the federal courts permitted reasonable regulations, and even at common law, those recognized as common carriers long before rate legislation which has for some purposes brought into their general terms some other kinds of business, there would seem to be no question about the validity of such provisions as are found on these transfer orders. It follows that the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs.*