## SUPREME COURT

### BREESE & MUMFORD agt. THE UNITED STATES TELEGRAPH COMPANY.

Where a *telegraph company* furnishes printed headings for the transmission of messages, containing certain terms and conditions upon which such messages will be sent, and an agreement that the same shall become binding upon both parties when signed by the person sending the message; the person who writes his message under such a heading and signs and delivers it accepts such printed proposition, and it thereupon becomes an agreement binding upon the company only according to its terms and conditions.

The person who signs and delivers such message is *estopped* from denying the agreement which he has signed, by alleging that he never read it. It is gross carelessness and negligence not to read such conditions and agreement before signing and delivering the message.

A person who signs such a paper must know that he signs it for some purpose, and when he gives it to the company must understand that it is to regulate the rights which it explains.

The peculiar and stringent rules by which *common carriers* are controlled and regulated can have very little just and proper application to *telegraph companies*. (*This seems to be adverse to the general tenor of the opinion in De Rutte agt. N. Y. Telegraph Co. 30 How.* 430.)

Even if a telegraph company is held to be an ordinary common carrier, it has the right to limit its liability by *express contract.* (*This agrees with De Rutte agt. N. Y. Telegraph Co. supra, and is undoubtedly well settled law. If this doctrine is well settled, it would seem also that it settles the question of the similarity of the rules which govern each carrier.*)

Where the plaintiffs delivered to the defendant for transmission from Palmyra, N. Y., to the city of New York, a message written under the general printed propositon and agreement of the defendants, directing the purchase of $700, in gold, without requiring a repetition of the message, and when delivered to the plaintiffs' correspondent in New York it read $7,000, in gold, instead of $700 : *Held,* that the plaintiff could not recover for the loss he sustained.

*Seventh District, Monroe General Term, March,* 1866.

*Before* WELLES, E. DARWIN SMITH *and* JOHNSON, *Justices.*

THIS was a controversy without action, submitted under section 372 of the Code, on the following facts :

On the 16th of March, 1865, George W. Cuyler, President of the First National Bank of Palmyra, acting for the plaintiffs, presented to the defendant, a corporation duly incorporated, and engaged in the business of transmitting messages and dispatches by electric telegraph for hire, over its line of wires, extending from the city of New York northwardly and westwardly, at its office in Palmyra, a certain dispatch written upon the ordinary blank of defendant, and requested the same to be transmitted to the parties to whom the same was addressed, and paid for such transmission the fee charged by defendant, but did not pay for, nor request to have the same repeated. The blank and message thereon written were as follows :

No. ——. To all points in the United States and British Provinces. Reg'd.

UNITED STATES TELEGRAPH COMPANY.

E. C. Fellows, Gen'l Supt., Syracuse, N. Y.

W. H. Kirtland, Ass't Supt., Rochester, N. Y.

N. Randall, President, Syracuse, N. Y.

S. C. Hay, Secretary, N. Y.

In order to guard against errors or delays in the transmission or delivery of messages, every message of importance ought to be repeated by being sent back from the station to which it is directed to the station from which it is sent, and compared with the orginal message. Half the tariff price will be charged for thus repeating and comparing. And it is hereby agreed, between the signer or signers of this message and this company, that this company shall not be held responsible for errors or delays in the transmission or delivery of this message, if repeated, beyond the amount of fifty dollars, unless a special agreement for insurance be made and paid for at the time of sending the message and the amout of risk specified on this agreement, and that in case this message is not repeated, this company shall not be held responsible for any error or delay in the transmission or delivery of same beyond the amount paid for transmission, unless specially insured, and the amount of risk paid for and specified on this agreement at the time; nor shall this company be held liable for errors in ciphers, or obscure messages; nor for any error or neglect by any other company over whose lines this message may be sent to reach its destination; and this company is hereby made the agent of the signer of this message to forward it over the lines of other companies when necessary. No agent or employee is authorized or allowed to vary the terms of this agreement or make any other or verbal agreement, and no one but the superintendent is authorized to make a special agreement for insurance. This agreement shall apply through the whole course of this message on all lines by which it may be transmitted.

"PALMYRA, March 16, 1865.

"Send the following message, subject to the above conditions and agreement:

"To Cammann & Co., No. 56 Wall street, New York:

"Buy us seven ($700) hundred dollars in gold.

"GEO. W. CUYLER, *President.*

"No. 2. Please write your address under your signature."

Cuyler had on hand at his office a lot of these blanks, which the defendant had left there to secure business, and took the blank in question from amongst the others and wrote the dispatch upon it. But neither Cuyler nor the plaintiffs had ever read the printed portion of said blanks. The message thus delivered was duly transmitted from the office at Palmyra, as written; but by some error of some of defendant's operators working between Palmyra and New York, the precise cause of which is unknown, it was received in New York and sent and delivered to Cammann & Co., in the following form: "To Cammann & Co., No. 56 Wall street, New York. Buy us seven thousand dollars in gold. Geo. W. Cuyler, President."

In consequence of the receipt of this message, Cammann & Co. immediately, on the same day, purchased on account of the plaintiffs $7,000 in gold coin, and paid for the same the then market price of $1.71 in legal tender notes for each dollar in gold. As soon as possible after the discovery of the error, the plaintiffs notified defendant of the same, and of the purchase, and tendered to the defendant the gold so purchased, at the price which had been paid, and gave notice that unless defendant elected to accept said gold at the price paid, the same would be sold at the public market for the highest price and defendant held liable for the loss. Defendant refused the tender, and the gold was accordingly sold at the best market price, which was $1.51¾ in legal tender notes, by which a loss was sustained of $1,244.25.

The plaintiffs seek to recover the amount of this loss, with interest.

CHARLES McLOUTH, *for plaintiffs.*

G. P. LOWREY, FRANSIOLI & SOREN, *for defendant.*

*By the court,* JOHNSON, J. It must be held, I think, that the printed heading to the paper on which the message

delivered to the defendant for transmission was written, was, under the circumstances, something more than a mere notice to the plaintiffs' assignor, by whom such message was written, signed and delivered. Before the message was written under it, and signed and delivered to the defendant, it was a general proposition to all persons desiring to send messages by the defendant's peculiar means of transmision or conveyance of the terms and conditions upon which such messages would be sent, and the defendant become liable in case of error or accident in the transmission or conveyance. By writing the message under it, and signing and delivering the same for transmission, the party accepted the proposition and it became an agreement, binding upon the defendant only according to the terms and conditions specified in its proposition. That such is the legal effect of the agreement under which the message in this case was received for transmission by the defendant, seems to me extremely clear. Under the date of the message, and the name of the place from which it was sent, was printed in large clear type: "Send the following message, subject to the above conditions and agreement." Directly under this the message was written and signed by the plaintiffs' assignor. There is no pretence that the "conditions and agreement" thus referred to, were not plainly printed, or that there was the least diffi- culty in reading and understanding the terms proposed by the defendant. There they stood, in clear, plain print. First, a general statement, that "in order to guard against errors or delays in the transmission or delivery of messages, every message of importance ought to be repeated by being sent back from the station to which it is directed to the station from which it was sent, and compared with the original message." Following this list is the tariff or rate charged for such repetition and comparison, as follows: "Half the tariff price will be charged for thus repeating and comparing." Then follow the terms and conditions in this language: "And it is hereby agreed between the signer or signers of this message and this company, that this company shall not be held responsible for errors or delays in the transmission

or delivery of this message, if repeated, beyond the amount of fifty dollars, unless a special agreement for insurance be made and paid for at the time of sending the message, and the amount of risk specified on this agreement, and that in case this message is not repeated, this company shall not be held responsible for any error or delay in the transmission or delivery of the same beyond the amount paid for transmission, unless specially insured, and the amount of risk paid for and specified on this agreement at the time." Here is no ambiguity whatever, but on the contrary, the language is well chosen, and the meaning and import perfectly clear and obvious to the most indifferent or careless reader. The price for transmission only was paid. There was no request to have the message repeated, and nothing was paid or offered therefor, and no insurance. The defendant is therefore exempt from all liability for the mistake or error complained of, by the express terms of the agreement.

It is stated, in the case made, that neither the person who signed the message nor the plaintiffs ever read the printed "conditions and agreement" thus subscribed. But it does not follow from this, by any means, that they are not bound by the conditions. They might and should have been read. It was very gross carelessness and negligence not to read them before signing and delivering the message. No notice was given to the agents of the defendant that the conditions and agreement to which the author and signer of the message had in terms agreed the same should be subject, he had in fact neglected to read, and inform himself as to their import. The presumption, in the absence of any notice, was that he had read and understood the proposition he had thus accepted; and the defendant's agents had the right to take it for granted that he had, and will be presumed to have done so, and to have sent in good faith the message upon the terms thus proposed and apparently accepted. The plaintiffs should not now be permitted to allege that their assignor either willfully shut his eyes and refused to see what was so plainly before him, or that he negligently omitted to use them for that purpose. To allow them now

to do this, would operate as a fraud upon the defendant. It would enable one party, through his own gross negligence and inattention, to create a liability against another in his own favor, where none was bargained for, or would have been, and which was expressly stipulated against. The principle of *estoppel in pais* applies in full force against the plaintiffs' claim. Their assignor, by his conduct, led the agents of the defendant to suppose and believe that he had agreed to the defendant's propositions, and they cannot now gainsay the apparent agreement.

In *Lewis* agt. *The Great Western Railway Company* (5 *H. & N.* 867), which was a case where the person delivering goods to a carrier filled up and signed a receiving note under a printed head of " conditions," under which were certain printed conditions, and which the party afterwards, in an action for the loss of the goods, claimed not to have read, Baron BRAMWEL said : " It would be absurd to say that the document which is partly in writing and partly in print, and which was filled up, signed and made sensible by the plaintiff, was not binding upon him. A person who signs a paper like this, must know that he signs it for some purpose, and when he gives it to the company, must understand that it is to regulate the rights which it explains."

I cannot refrain from observing here, that the business in which the defendant is engaged, of transmitting ideas only, from one point to another by means of electricity operating upon an extended and insulated wire, and giving them expression at the remote point of delivery by certain mechanical sounds, or by marks or signs indented, which represent words or single letters of the alphabet, is so radically and essentially different, not only in its nature and character, but in all its methods and agencies, from the business of transporting merchandise and material substances from place to place, by common carriers, that the peculiar and stringent rules, by which the latter is controlled and regulated, can have very little just and proper application to the former ; and all attempts heretofore made by courts to subject the two kinds of business to the same legal rules and liabilities

will, in my judgment, sooner or later, have to be abandoned, as clumsy and indiscriminating efforts and contrivances to assimilate things which have no natural relation or affinity whatever, and at best but a loose or mere fanciful resemblance. The bearer of written or printed documents and messages, from one to another, if such was his business or employment, might very properly be called and held a common carrier, while it would be little short of an absurdity to give that designation or character to the bearer of mere verbal messages delivered to him by mere signs or speech, to be communicated in like manner. The former would have something which is or might be the subject of property, capable of being lost, stolen and wrongfully appropriated; while the latter would have nothing in the nature of property which could be converted or detstroyed, or form the subject of larceny, or of tortious caption and appropriation, even by the "king's enemies." But even if the defendant is held to be an ordinary common carrier, it had the right to limit its liability by express contract, as is now well settled. (*Bissell* agt. *New York Central Railroad Company*, 25 *N. Y.* 442; *Dorr* agt. *N. J. Steam Navigation Company*, 1 *Kern.* 485.)

In *MacAndrew* agt. *The Electric Telegraph Company* (17 *Com. B.* 3; 84 *E. C. L. R.*), it was held that a mere regulation of the corporation, similar to the one here in question, was a reasonable regulation under the act 16 and 17 Victoria, and shielded the corporation from liability for the mistake of sending the message to Southampton instead of Hull; and so in *Camp* agt. *The Western Union Telegraph Company* (1 *Metcalfe, Ky.* 164), it was held that a printed notice similar to the conditions here, not in the form of an agreement, was a reasonable regulation on behalf of the company, and binding upon the person delivering the message to be transmitted. Our statute providing "for the incorporation and regulation of telegraph companies" (*Sess. Laws of* 1848, *chap.* 265, §11), makes it the duty of the owner of any telegraph line doing business within this state, to receive dispatches, and on payment of their usual charges for transmitting dispatches, "as established by the rules and regula-

tions of such telegraph line, to transmit the same with impartiality and good faith," under a certain prescribed penalty. Thus the statute, it will be seen, recognizes the right of the owners of these lines of communication, to "establish rules and regulations" for the transmission of communications, delivered to be forwarded, in nearly the same terms as the act of 16 and 17 Victoria. The legislature obviously never intended that these corporations, or persons engaged in this novel, interesting and extraordinary business, should be placed upon the same footing in respect to liability with ordinary carriers of goods.

There is no question here of gross negligence, against which the defendant could not, as carrier even, shield himself by contract. The case states that the message was duly transmitted from the office at Palmyra, as written and delivered, "but by error of some of defendant's operators working between Palmyra and New York, the precise cause of which is unknown," it was received in New York and delivered as an order to purchase $7,000 in gold instead of $700, according to the message delivered and duly transmitted at Palmyra. In view of the nature of this business, and of the peculiarly delicate and subtle agencies and forces employed in carrying it on, it is impossible for the court to say, from the statement, that the error complained of was the result of any negligence or inattention whatever on the part of the agents employed by the defendant. For aught we can see it may have been produced by causes over which no person had any control. And these considerations show most forcibly the importance and necessity of allowing those carrying on this business the right to make rules and regulations and contracts, limiting and controlling, to a reasonable extent, the grounds and measure of their liability.

For the foregoing reasons, I am of the opinion that the facts stated in the case made do not entitle the plaintiffs to any recovery. The defendant must, therefore, have judgment for its costs.

Judgment accordingly.