# CASES

IN THE

# SUPREME JUDICIAL COURT

OF THE

# STATE OF MAINE.

———◆———

GEORGE W. TRUE & another *vs.* INTERNATIONAL
TELEGRAPH COMPANY.

60   9
97  174

*Telegraph companies—power to limit their liability. Reasonable regulation—
what is not. Damages—rule of, for non-delivery of night messages.*

The defendant company transmitted messages during the night, known as night
messages, at about one-half of the usual rates charged for day messages.
And the plaintiffs having received a telegram offering them a cargo of corn, at
ninety cents per bushel, went to the defendants' office, and, calling for one of
their 'night-message blanks,' on which was printed, 'It is agreed between.
the sender of the following message and this company, that the company shall
not be liable for mistakes or delays in the transmission or delivery, or for non-
delivery of. any message beyond the amount received by said company for·
sending the same,'—'send the following message subject to the above terms,
which are agreed to,' replied by writing thereon a message, properly ad-
dressed, of the following tenor : 'Ship cargo named at ninety, if you can
secure freight at ten—wire us the result,' and paid forty-eight cents, the rate
for night message. The message was sent but not delivered, by reason
whereof, the plaintiffs failed to obtain the corn at the terms offered, and the
price of corn and freight immediately advanced. The defendants admitted
their liability to the extent of sum. paid. *Held,* That the terms of the fore-
going condition are not reasonable, and do not exonerate the company
from liability beyond the sum paid for the transmission of the message.
APPLETON, C. J., *dissenting.*

VOL. LX.       2

*Held,* also, that the rule of damages in such case is the difference between the price named, and that which the plaintiff would have been obliged to pay at the same place, in order by due diligence, after notice of the failure of the telegram, to purchase the like quantity and quality of corn, with the same rule in relation to the freight.

In the absence of any statutory restriction, a telegraph company may, before sending dispatches, prescribe the terms upon which alone it will send them. APPLETON, C. J.

If the terms are assented to, they constitute a contract between the sender and the company. APPLETON, C. J.

The rule of a telegraph company, understandingly assented to by the sender, that the company will not be liable for the non-delivery of any night message beyond the amount received by the company, not being inconsistent with R. S., c. 53, § 1, will exonerate the company from liability beyond that amount· APPLETON, C. J.

ON FACTS AGREED in the superior court for this county.

On January 12, 1870, the plaintiffs received a telegram, at Portland, from Messrs. Radcliff & P itterson, of Baltimore, offering to sell them a cargo of corn, at ninety cents per bushel. Thereupon one of the plaintiffs went to the office of the defendants, in Portland, and, calling for one of the defendants' 'night-message blanks,' wrote thereon, the tenor of which, with that of the blank on which it was written, was as follows :

#### ' NIGHT-MESSAGE BLANKS.

Office managers will not receive " night messages " unless written hereunder, and then only for places on the International and connecting lines where night operators are employed, east of St. Louis.

#### THE INTERNATIONAL TELEGRAPH COMPANY.

This company will transmit messages between the principal cities on its lines east of St. Louis, during the night, and deliver the same the succeeding morning, on the following terms :

For a message of twenty words or less, the usual tolls on a ten-word message will be charged.

For a message of more than twenty words, and not exceeding sixty words, twice the usual tolls on a ten-word message will be charged.

For a message of more than sixty words, and not exceeding one hundred and twenty words, three times the usual tolls on a ten-word message will be charged.

For each additional one hundred words, or part thereof, in excess of one hundred and twenty words, the usual tolls on a ten-word message will be charged in addition.

Such messages will be known as "night messages," and must be written hereunder, otherwise full tariff rates will be charged thereon. They will be received for transmission at any time during the day or evening, and will be sent during the succeeding night. No additional charges will be made for cipher messages.

And it is agreed between the sender of the following message and this company, that the company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery of any message, beyond the amount received by said company for sending the same.

W. E. GOULD, *Treasurer.*      E. K. HARDING, *President.*

PORTLAND, Jan. 12, 1870.

Send the following message, subject to the above terms, which are agreed to:

To Radcliff & Patterson, Baltimore,—Ship cargo named at ninety, if you can secure freight at ten—wire us result.

GEO. W. TRUE & Co.'

The message thus written was delivered to the clerk of the defendants, and the sum of forty-eight cents paid for its transmission by night to Baltimore; but the telegram was never delivered to Radcliff & Patterson, at Baltimore. The defendants admitted their liability for non-delivery, but claimed that they were not liable beyond the forty-eight cents paid.

By reason of the non-delivery of the telegram, the plaintiffs failed to obtain the cargo of corn, at the terms offered, and the price of corn and the rate of freight advanced immediately, and the plaintiffs lost the profits which they might have made thereon, and were obliged immediately to buy other corn, at higher prices, in carrying on their business.

The day-message blank of the defendants was of the following tenor :

'The sender of this message agrees to the following terms : The company is in no case liable for more than the sum received, for mistakes, or delays, or for the non-delivery of any message, unless requested to repeat it, upon payment therefor; nor for more than fifty times the sum received for any repeated message, unless paid for insuring it.   The company is not liable for errors caused by messages being written obscurely, or in cipher; nor for unavoidable interruptions in its lines.   And in sending messages over other lines, it is liable only as agent therefor.   Nor is it liable upon any claim, unless it is presented to the president or treasurer in writing, within sixty days after its origin.

E. C. BAILEY, *President.*      S. F. HERSEY, *Vice-president.*

W. E. GOULD, *Treasurer.*

187

Send the following message—subject to the above terms, which are agreed to.   To—'

If the plaintiffs were entitled to recover more than the amount paid by them for the transmission of said message, with interest thereon, upon the facts agreed, the full court to determine the rule upon which damages shall be assessed, and remand the case to the superior court, where damages will be assessed upon further hearing, by the judge of that court.

*Symonds & Libby,* for the plaintiffs.

Telegraph companies are not private bailees for hire; they exercise a public employment analogous to that of a common carrier, and the law applicable to common carriers furnishes a sure standard by which to determine the measure of their liability.   'Their obligations, as far as they reach, spring from the same source, viz., the public nature of their employment and the contract under which the particular duty is assumed.'   *Parks* v. *Alta Cal. Tel. Co.* (1859), 13 Cal. 422 ; *Bowen* v. *Lake Erie Tel. Co.* (1858), 1 Am. Law Reg. 685 ; *Wash. New Orleans Tel. Co.* v. *Hobson*

(1860), 14 Grattan, 122; *N. Y. & Wash. Print. Tel. Co.* v. *Dryburg* (1860), 35 Penn. 298; *Bryant* v. *Am. Tel. Co.* (1865), 1 Daly, N. Y. 575; *De Rulte* v. *N. Y. & Albany Tel. Co.* (1865), 1 Daly, N. Y. 547; *Ellis* v. *Am. Tel. Co.* (1865), 13, Allen, 226.

Public policy demands the application of as stern a rule of responsibility in the case of telegraph companies as in the case of common carriers. Am. Law Reg. N. S., vol. 4, p. 199.

And no reason exists for extending the power of restricting their liability by printed notices beyond the point recognized in the case of common carriers.

The latter cannot protect themselves from the consequences of their own negligence or that of their servants, either by general notices or express contract. Such contracts are in violation of public policy which is the basis of their liability. *Newbern* v. *Just,* 2 C. & P. 76; Angel on Com. Car. §§ 267, 275; 2 Greenl. on Ev. § 215.

These principles are applicable to telegraph companies. 2 Redfield on Railways, § 12, p. 287; Redfield on Carriers, § 552; *Ellis* v. *Am. Tel. Co.*, 13 Allen, 226; *Burney* v. *N. Y. & Wash. Tel. Co.*, 18 Md. 34; *De Rulte* v. *N. Y. & Albany Tel. Co.*, 1 Daly, 547; Sedgwick on Damages, 413.

All rules for the conduct of their business must be reasonable, and the courts must determine this question in the last resort. The 'Condition' printed on the blank of this company is unreasonable and is not binding. It attempts to screen the company from the consequences alike of its gross carelessness or willful default, and leaves the company at liberty to send the message or not, at their option.

The amount paid for the message does not measure the liability of the company; whatever the amount paid, their liability for negligence is the same.

Scott & Jarnagin on Law of Telegraph, §§ 255, 256, and cases before cited.

The law of damages in cases like the present is well settled.

The party injured by a breach of contract is entitled to recover all his damages, including gains prevented and losses sustained, provided they are certain, and such as might naturally be expected to follow the breach. The rule is not based so much on what is supposed to have been the actual expectation of the parties, as what it ought to have been under the circumstances, if their minds had been drawn towards the contingency of a failure in performance. Every commercial telegram is supposed to have a value, and in the present case the nature of the transaction was clearly indicated by the language of the message. *Hadley* v. *Baxendale*, 9 Ex. 341. *Colver* v. *Griffin*, 16 N. Y. 489; Sedgwick on Damages, vol. 2, pp. 301, 418; Redfield on Railways, 294; *U. S. Tel. Co.*, v. *Wenger*, 55 Penn. 262; 'Law of Telegraphs,' § 397; *Landsberger* v. *Magnetic Tel. Co.*, 32 Barb. 550; *Parker* v. *Alta Cal. Tel. Co.*, 13 Cal. 422; *Rittenhouse* v. *Independent Line Tel. Co.*, 1 Daly, 474; *John P. Squire et als.* v. *Wes. Union Tel. Co.*, 98 Mass. 232; *Bowen & McNancer*, v. *Lake Erie Tel. Co.*, 1 Am. Law Reg. 685; *N. Y. & Wash. Print. Tel. Co.* v. *Dryburg*, 35 Penn. 298; *De Rulte* v. *N. Y. & Alb. Tel. Co.*, 1 Daly, 547.

Plaintiffs are entitled to recover the difference between the price of the cargo offered and the price at which they were obliged to buy, together with the difference in freights.

*Davis & Drummond*, for the defendants.

1. Telegraph companies may fix reasonable terms for doing their business, and those who employ them are bound by such terms. And the terms fixed by the defendants in this case for 'night messages' are reasonable. *McAndrew* v. *Electric Tel. Co.*, 84 E. C. Law, 3; *Camp* v. *W. Union Tel. Co.* 1 Met. (Ky.), 164; *Wann* v. *W. Union Tel. Co.*, 37 Mo. 472 (26 U. S. Dig. 519); Am. Law Reg., July, 1868, p. 615.

2. The writer of the message is presumed, without proof, to know the rules of the company. And he cannot set up the fact (nor is it attempted in this case), that he did not read the heading of the blank. *Birney* v. *N. Y. Tel. Co.*, 18 Md. 341; *Breese* v.

*U. S. Tel. Co.*, 45 Barb. 274; *Carew* v. *W. U. Tel. Co.*, 15 Mich. 525 (Law Reg., Jan., 1868, p. 319); *Ellis* v. *Am. Tel. Co.*, 13 Allen, 226.

KENT, J. On the 12th of January, 1870, the plaintiffs received a telegram from a firm in Baltimore, offering to sell them a cargo of corn at ninety cents per bushel. Whereupon one of the plaintiffs went to the office of the defendants and asked for one of the 'night message blanks,' and wrote thereon the following telegram, addressed to the said firm, and paid forty-eight cents, the sum demanded. 'To Radcliff & Patterson, Baltimore;—Ship cargo named at ninety; if you can secure freight at ten, wire us result. Geo. W. True & Co.'

It is admitted that the telegram was never delivered to Radcliff & Patterson. It is also admitted that the message was sent the same night to Boston, which is the western terminus of defendants' line, and was thence forwarded by the Franklin Telegraph Company, with which the defendants have a business connection, making them responsible for the whole distance; the lines of the Franklin company extending through Baltimore to Washington. No reason is assigned for the non-delivery of the message.

1. The defendants admit their liability for the mistake or delay in the transmission, and for the non-delivery of the telegram. This is an important fact, and relieves the case of any difficulty in determining this primary and fundamental point of actual liability.

2. The defendants claim that this liability is limited to the repayment of the forty-eight cents. The plaintiffs claim damages for losses sustained by them, beyond this small sum, by reason of the non-delivery of the message.

3. This claim of exemption, on the part of the telegraph company, is based upon a special condition, contained in the paper, on which the message, signed by the plaintiff, was written.

That paper, called a 'Night Message Blank,' contained, above the written message, several printed specifications of the terms and conditions on which these night messages would be received and forwarded. The last one was in these words:

' And it is agreed between the senders of the following message and this company, that the company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery of any message, beyond the amount received by said company for sending the same.'

Then follows, next above the written message, the words, ' Send the following message, subject to the above terms, which are agreed to.'

There can be no doubt that the above condition, with the assent signified by the signature of the plaintiffs, covers this, and all other cases of mistake or non-delivery. The question is whether the contract can legally be thus limited, and the defendants be thereby exonerated for all liability, to the extent claimed.

There has been much discussion in various cases, as to the nature of this comparatively new contract for the transmission of messages, by means of electricity; and the liabilities, limitations, and qualifications of this undertaking. It has been likened to the case of a common carrier, and it is contended by many, that all the strictness of the common law, applicable to carriers, is to be applied to telegraph companies. On the other hand, it is contended that they are but simple bailees for hire, to do a certain specified thing, —' *locatio operis faciendi.*' It is clear that telegraph corporations or companies exercise a public employment, or as said by C. J. Bigelow, 13 Allen, 226 (*Ellis* v. *A. Telegraph Co.*), a *quasi* public employment; certainly as much so as express companies, or stagecoaches, or railroads. They often invoke the exercise of the right of eminent domain. They everywhere announce a readiness to transmit messages for all applicants, at fixed rates. The nature of their undertaking is analogous to that of carriers. One assumes to transmit a letter, the other a larger, sealed package, to a given destination. Both are bound by certain rules of law, and held to a faithful and exact performance of a specified duty. So far as public policy is concerned, there seems to be but little reason for not holding both to the same rules. It might be interesting to follow out these analogies, and to enter upon the discussion of various

questions, touching the extent of the common law and statute liabilities of these companies, and the extent of the right and power of these companies, to limit their liabilities by notice or conditions, apparently assented to by the other party.

But the case before us does not require this extended examination. It presents to us the single question, whether this condition is one which the company could rightfully impose upon its undertaking.

We are satisfied that telegraph companies, like all other corporations and individuals, may prescribe, adopt, and enforce reasonable rules and regulations for the convenient and prompt and satisfactory performance of their duties and obligations, not inconsistent with that performance. We think they may go further, and establish stipulations and regulations, to some extent restraining and limiting their common-law liabilities, made known to, and directly or indirectly assented to, by those employing them.

We are equally well satisfied, that there is a limit to this power of avoidance of legal liabilities. It does not rest with such companies to fix these conditions absolutely, by which they may avoid duties and responsibilities, by their mere will, or by their views of self-interest, or desire to shield the company or its officers from the direct consequences of neglect or carelessness.

The public and those who employ these agencies to perform important services, have rights, which cannot be ignored or avoided by stipulations made by interested parties. When a company assumes the position of offering its services generally, to all who may apply, under its character of a public corporation, it does not stand exactly in the same position as private individuals contracting in a single matter, on terms and conditions mutually agreed upon for that particular case.

The discussions in the text-books and in the decided cases have led to the conclusion, that whilst, in the first instance, the company may make its rules for the regulation of its business, and for the limitation of its liability, those rules must be reasonable, in view of all the circumstances, and of the nature of the business, its risks

and responsibilities, the necessity of securing to the public, who may have occasion to use this means of transmission, a reasonable protection against neglect or fraud or want of due care and effort, to perform punctually and correctly the act undertaken.

The company is not the ultimate judge of the reasonableness of an adopted rule. And in this single proposition, lies the gist of the whole matter. The court must determine in every case, when the question is directly raised, whether the particular restriction or qualification is a reasonable exercise of the powers residing in the company.

Several questions, as to reasonableness, have arisen under different conditions made by telegraph companies, and have been considered by the courts. One of them has arisen under a condition, which is found in the general blank of the defendant company, by which it is stipulated that the company will not be responsible, for more than the sum received, for mistakes or delays, or for non-delivery of any message, unless requested to repeat it on payment therefor, nor for more than fifty times the sum received for any repeated message, unless paid for insuring it.

It seems to be held, that however it may be in cases where the error causing the injury was occasioned by not repeating, or would have been manifestly prevented or avoided by repeating, yet this condition could not cover and excuse negligence or delay in delivering a message received, or any other nonfeasance or misfeasance not imputable to or excused by not repeating. *Graham* v. *Western Union Telegraph Company*, recently decided by the supreme court of Colorado, Am. Law Register, May 10, 1871; *Burney* v. *N. York & Washington Telegraph Company*, 18 Md. 341.

In the case at bar, no such question arises. No such condition is found in the 'night message blanks' of the company. These messages are of a special class, and are made subject to their own rules, as printed on the blanks. The charge for transmission of these night messages is considerably less than on those in the general business of the company, and, perhaps for this reason chiefly, the whole provision relating to repeating is omitted, and the sweep-

ing and comprehensive provision by which in effect all liability, beyond the price paid, is avoided is substituted. It is clear that a mere change of rates or prices cannot avoid legal liability. The duty and responsibility of the company cannot properly be measured by the price paid for the duty undertaken.

The single question on this part of the case is whether the stipulation, recited in full at the commencement of this opinion, is a reasonable one, or one which the company could lawfully impose as a condition of the contract.

After a careful reading, it seems difficult to give any other construction to this clause than a general and unlimited exemption from all and any liability beyond the sum paid. It is not limited to those cases where reasonable care and attention might not prevent mistakes or delays. It makes no reference to the subtle and mysterious agency employed in the transmission of messages, or to the peculiar liability to error in the work of the operator. As before stated, this provision, in relation to night messages, does not require the repeating of telegrams sent, before a liability should attach. It simply and nakedly exonerates the company from all liability (except for the fee paid) for any and all mistakes in the transmission of the message—and for all delays in transmitting—and all delays in delivery, or even non-delivery of the telegrams. These items seem to include all the cases of neglect, want of care or attention of which the company can be guilty, in reference to the performance of their duties and obligations under the contract. Even gross negligence and the want of the lowest degree of care are protected from complaint, although affirmatively proved by the other party. The operator may, from sleepiness or haste to close for the night, prefer to pay back the trifle paid, and leave the message unsent. Or a message may have been carelessly or even wantonly thrown into the waste basket, and never sent, or if sent it may have been treated in the same manner at the office of reception, and never delivered to a carrier, or if so delivered, it may have been thrown aside or destroyed by the carrier to save himself labor or trouble. And the sender, under this rule, must be debarred from

all remedy beyond a repayment of the few cents paid.    This is not the establishment of a rule or rules for the management of the business which are reasonable and proper for the orderly conducting of its business, or to protect the company against unfair or unreasonable claims.    In this case no attempt is made to excuse the non-delivery ; but a liability is admitted.

We think this stipulation is not reasonable, for it does not come within any established principle, applicable to employments of this nature, whether called public or private.    It goes altogether too far in attempting to cover all possible delinquencies.    'A party cannot in such a way protect himself against the consequences of his own fraud or gross negligence, or the fraud or gross negligence of his servants and agents.' *Ellis* v. *The American Tel. Co.*, 13 Allen, 234. In the case of *Birney* v. *New York & Wash. Tel. Co.*, 18 Md. 341, the court say that 'courts and legislatures have been liberal in allowing companies to provide against such risks as arise out of atmospheric influences and kindred causes.    At this point they have properly stopped.    To permit them to contract against their own negligence would be to arm them with a most dangerous power; one, indeed, that would leave the public almost remediless.    It must be borne in mind that the public have but little choice in the selection of the company which is to perform the desired service.    They do not select the agents or employees, nor can they remove them. They are bound to take the company as they find it, and to commit to its agents their messages, however valuable they may be. Such being the case, public policy, as well as commercial necessity, require that companies engaged in telegraphing should be held to a high degree of responsibility.'

We restate our propositions and conclusions on this part of the case in order to prevent any misapprehension of the extent and limitations of the rules laid down.

1. This company, and all others of a like nature, offering and undertaking to perform acts or services for all applicants, at fixed rates, exercise at least a *quasi* public employment.

2. Such company may adopt and enforce reasonable rules and

regulations for the convenient and prompt and satisfactory performance of the act or duty undertaken.

3. This right in the company is not absolute and unlimited; but such rules are subject to the test of reasonableness in view of the rightful claims of public policy and private rights, and the enforcement of the obligation of good faith and honest effort to perform.

4. The test must be applied by the court, whenever the question arises on the validity of any such regulation, according to the rule before stated.

5. A rule, or stipulation, like the one in question, which covers all possible delinquencies, mistakes, delays, or neglects in transmitting or in delivering, or not delivering a message, from whatever cause arising, is not, for the reasons before stated, a reasonable regulation within the legal rule.

6. Such a rule is not saved from these objections, by the condition of a liability to repay, if required by the sender, of the trifle paid to them. It is a mere evasion of the legal liability and is never the measure of damages for non-performance of a contract of this kind.

It is an insufficient and, therefore, an unreasonable stipulation, and cannot save the otherwise clearly objectionable condition of which it is a part.

Another question is presented relating to the rule of damages. It is agreed, according to the report of the case, that ' if the plaintiffs are entitled to recover a greater sum (than thirty-eight cents) as special damages upon the facts aforesaid, this court is to determine the rule upon which damages shall be assessed.

The measure of damages in cases of this kind has been much discussed in the text-books and decisions in this country and in England. It would seem to be impracticable to attempt to lay down any single and simple rule, which can be made to apply, without qualification, to every case. There are, however, certain general principles, which may be considered as applicable, generally, to these cases, and to be now quite well established.

Before considering these principles, with these qualifications and

limitations, it may be well to examine the character and exact extent of the message in the case before us. We may then be better able to apply the rules, established or admitted, to this particular case. For it is the rule for this case, that we are called upon to define.

We assume that the plaintiffs can prove that the firm in Baltimore, to whom the telegram was addressed, had offered and agreed to sell a cargo of corn at ninety cents per bushel to the plaintiffs ; that the telegram contained notice of acceptance of the proposition ; that the condition named, 'if you can secure freight at ten' (cents), could have been complied with, if the message had been delivered when it should have been ; that, if it had been thus delivered, the bargain would have been closed, and the plaintiffs would at that moment have obtained the cargo at ninety cents per bushel, with freight at ten cents.

The pecuniary value, then, of this telegraphic message was in this, that it contained a part of a contract, and that the final and binding and effectual act, by which the bargain would become operative and complete. It seems clear, that such a message has a distinctive and clear pecuniary value, and demands of the party, who, for a reward, undertakes to convey it, knowing its contents, the same care and diligence ; and that he is subject, at least, to like rules and liabilities, as if he (not being a common carrier), had undertaken to transport an article of merchandise.

On its face it gives clear intimation that it is of a business character, relating to a distinct and specific contract, and that, according to the well-known custom of merchants, it must have been understood by the operator or agent as an acceptance of an offer to sell a cargo at the price named, if freight at ten cents could be procured.

In this respect it differs from a class of cases to be found in the reports, where the message was so brief or enigmatical, or so obscure, that it gave the operator no notice that it was of any value pecuniarily.

It differs also from another class in this, that it is not a gen-

eral order to buy, if thought best, or if market had an upward tendency, or if there was a probable chance of profit, or any like condition. This telegram is a distinct acceptance of an offer, at a fixed price, of a cargo. Its binding efficacy was not dependent upon any contingency, or rise or fall in the market. If it had been duly delivered, the plaintiffs would have been, at that moment, the purchasers and owners at Baltimore of a cargo of corn at ninety cents, with freight at ten cents. It was not delivered, and the plaintiffs were not at that time and place such owners, as between the plaintiffs and defendants, the plaintiffs were entitled to be, at such price. They would have been such, but for the neglect of the defendants. What is the measure of damages? Clearly not the price paid for the transmission only. Paying that back would be rather in the nature of a rescission of the contract, than damages for its non-performance. And we have before determined, that the special condition was not binding so as to exonerate from all other damages occasioned by neglect or want of common care and attention in the performance of the contract and duty assumed.

A more difficult question arises in fixing an exact rule in determining the amount of damages in this case.

The general rule is familiar, and is among the rudimental axioms of the law.

In this State, the general doctrine was laid down at an early day in *Miller* v. *Mariner's Church*, 7 Greenl. 51, in an opinion of the court drawn by Mr. Justice *Weston* in his usually clear, discriminating, and accurate style, and precision in use of language. 'In general, the delinquent party is holden to make good the loss occasioned by his delinquency. But his liability is limited to direct damages, which, according to the nature of the subject, may be contemplated or presumed to result from his failure. Remote or speculative damages, although susceptible of proof, and deducible from the non-performance, are not allowed. And if the party injured has it in his power to take measures by which his loss is less aggravated, this will be expected of him. If the party entitled to the benefit of a contract can protect himself from loss, arising from

a breach, at a trifling expense, or with reasonable exertion, he is bound to do so.'

The above extract, as it seems to us, contains the substance of the whole law applicable to this subject, and the germ from which long chapters and long opinions have been expanded. It is constantly cited as an early and authoritative statement of the legal rule on this subject.

The principles and rules laid down in this case have been reaffirmed in our court in many cases. In *Berry* v. *Dwinel*, 44 Maine, 255, it is held that 'remote and consequential damages, possible gains, and contingent profits are not allowed.' The rule was applied in this case to possible or actual loss to plaintiff in the future, which the defendant set up as a defense to recovery of damages, for non-delivery of logs at a stipulated price and time.

*Perkins* v. *P. S. & P. R. R.*, 47 Maine, 592 ; *Ripley* v. *Mosely*, 57 Maine, 70, and cases there cited. In that case it was held, that when the loss is not speculative nor dependent upon contingencies, but is one of the natural and direct results of the act, it may be recovered. But loss of probable profits is too uncertain and problematical to be a basis for estimation of damages.

In an English case, *Hamlen* v. *G. N. Railway*, 1 H. & N. 408, it is laid down as a general principle, that no damages can be given on contracts, which cannot be stated specifically.

Redfield, in his chapter on Telegraph Companies, § 1896, thus states it as applicable to such companies: 'The company must make good the loss resulting from any default on their part.' But what loss ? Can a party recover for every loss, or injury which he can show, by facts subsequently occurring, did in truth result to him from the failure of duty on the part of the other party ?

The clear preponderance and weight of the decisions are, that the qualification, which was thought formerly to be sufficient to meet all cases, is not satisfactory. That qualification was, that the injury must be the ordinary, natural, or even necessary result of the breach. But loss of profits may be clearly shown to have been occasioned by the failure, and from no other cause. So injury and

loss may be directly traced to the same cause, when the party is prevented from availing himself, by this breach of one contract, of some other collateral and independent contract entered into with other parties. Or where a party has been prevented from doing some act, or making some investment in his own business, not necessarily connected with the agreement in question.

These damages are disallowed, not because they cannot be traced directly as the immediate and undoubted effect of the breach, but because they are in their nature uncertain and contingent, and, perhaps more decidedly, because they are not such as would naturally flow from such a breach, and could not fairly be considered as having been within the contemplation of the parties at the time of entering into the contract. This rule necessarily excludes all remote, speculative, and uncertain results, as well as possible profits, advantages, and other like consequences which might have arisen, or which it can be shown would have arisen from the performance of the contract. This seems to be the doctrine in other States and in England. *Squire* v. *Western Union Telegraph Co.*, 98 Mass. 232; *Griffin* v. *Colver*, 16 N. Y. 490; *Leonard* v. *N. Y. Tel. Co.* 41 N. Y. 565; *Freeman* v. *Chute*, 3 Barb. 426; *Blanchard* v. *Ely*, 21 Wend. 342; *The Sch. Lively*, 1 Gall. 315; *Graham* v. *Western Union Tel. Co.* (Colorado), before cited; *Hadley* v. *Baxendale*, 26 Eng. L. & Eq., a leading case on resulting damages. Other English and American cases might be cited, bearing more or less directly on the subject. They can be found collected in Sedgwick on Damages, and other text-books.

But the negation of certain elements still leaves the true rule undetermined. This, we think, is to be found in the application of the principle, which, excluding all uncertain, problematical, and contingent profits, holds the party liable for the immediate and necessary result of the breach, and which may fairly be presumed to have been in contemplation of the parties at the time, and are capable of being definitely ascertained by reference to established market rates.

Now, in the case before us, the plaintiffs should have had, at the

time when the dispatch should have been delivered, a cargo at ninety cents and freight at ten cents. The natural consequence of this neglect, one which might well be anticipated or be in contemplation of the parties, was that the bargain would be lost, and that the cargo might be sold to other parties, or the seller would decline to accept a repetition of the offer, afterwards at same price. Plaintiffs wanted the cargo and had a right to have it at the price named. What was the damage?

Here comes in the second proposition in *Miller* v. *Mariner's Church*, viz., that the party should not at once abandon all attempts to procure the corn, and rest upon a claim for indefinite and possible profits which he might have made by a rise in the market, if he had obtained the article at the time, but must use reasonable diligence, after notice of the failure, to procure the same quantity, and the lowest freights, at the then market rates.

The sum, therefore, which would be a compensation for the direct loss and injury sustained by the non-delivery of this message, is the difference (if at a higher rate) between the ninety cents named and the sum which the plaintiffs were or would have been compelled to pay at the same place, in order, by due and reasonable diligence, after notice of the failure of the telegram, to purchase the like quantity and quality of the same species of merchandise. and the same rule applies to any increase of freight from the sum named, if it be shown that the corn could have been shipped by the sellers, at that rate, if the telegram had been duly received.

The case of *Squire* v. *W. U. Tel. Co.*, 98 Mass. 232, adopts this view, in a case very nearly resembling this in its facts.

*Rittenhouse* v. *In. L. of Tel.*, 1 Daly, N. Y., where the operator made a mistake in the article ordered, it was held that the company must make good the difference between the price of the article actually ordered, at the time when ordered, and the price of the same article, if purchased as soon as the mistake was discovered.

*U. S. Tel. Co.* v. *Wenger*, 55 Penn. An order to buy stocks; no reason given why not delivered; a case of negligence; stocks

ordered not bought on the day; they would have been, if telegram had been received, but were purchased three days afterwards at an advance. That difference, the court say, is undoubtedly the damages the plaintiff has sustained and is entitled to recover. 'The dispatch was such as to disclose the nature of the business to which it related, and that loss might be very likely to occur if there was a want of promptitude in transmitting it.' *Leonard* v. *N. Y. Tel. Co.*, 41 N. Y. 565, before cited, a case of mistake; *Griffin* v. *Culver*, 16 N. Y. 490; *DeRulte* v. *N. Y. & Al. and B. R. Tel.*, 1 Daly, 547; *Parks* v. *Alta Cal. Tel. Co.*, 13 Cal. 422.

In our own State, in the case of *Berry* v. *Dwinel*, before cited, the rule, in an analogous case, is thus stated; 'When a party contracts to deliver goods at a particular time and place, and no payment has been made, the true measure of damages is the difference between the contract price and that of like goods at time and place where they should have been delivered.'

And so it has been held that a common carrier, who unreasonably delays to transport or deliver goods intrusted to him, will be held to pay the difference between the market value at time and place when and where they ought to have been delivered, and the market value at that place on day of actual delivery. And this although no special contract as to time, and no special intended use, and no deterioration in the quality of the article. *Cutting* v. *G. T. R. R.*, 13 Allen, 381. The same decision has been made by this court in *Ball* v. *Railroad*—not reported. See *Weston* v. *G. T. R. Co.*, 54 Maine, 376.

> *Case remanded to the superior court, the damages to be assessed by the presiding judge of that court, upon further hearing, according to agreement of parties, and the rule of damages given in the opinion in the case.*

CUTTING, WALTON, BARROWS, and DANFORTH, JJ., concurred.

The following dissenting opinion was pronounced by

APPLETON, C. J. This is an action on the case against the defendant corporation for negligence in not delivering a night message.

It is agreed that on the 12th of January, 1870, the plaintiff received a telegram from Radcliff & Patterson, of Baltimore, offering to sell them a cargo of corn at ninety cents per bushel; that the plaintiffs went to the office of the defendants, and, calling for one of the 'night-message blanks,' wrote thereon a telegram in reply, which is made part of the case and will be hereafter considered.

This message was delivered to the clerk of the defendants and the sum of forty-eight cents paid for its transmission by night to Baltimore. The defendants the same night sent the message to Boston, which is the western terminus of their lines, and the same was thence forwarded by the Franklin Telegraph Company, with which the defendants have a business connection, making them responsible for the whole distance, the lines of the latter company extending through Baltimore to Washington. The telegram was never delivered to Radcliff & Patterson.

In the absence of any statutory enactment, any individual or corporation having acquired the right so to do from the patentee, may send messages for others by the telegraph. Before sending them, the operator may prescribe the terms upon which alone he will send them. If the terms are assented to, they constitute a contract between the sender and the individual or company agreeing to transmit them. The contract may limit the damages to any amount agreed upon, in case of failure to transmit. The telegraph company may warrant the transmission and make itself liable for all damages if the message is not received. It may require all messages to be repeated as a condition of its liability. It may limit the damages to fifty times the price paid for transmission; or, in case the message is sent by night, to the repayment of the sum received. These, or any other terms, when understandingly agreed to, are as binding as any other contract, unless the general liberty of contracting in reference to sending telegraphic messages is inhibited.

By the common law there was no such inhibition before this great discovery, for it was not foreseen that any such would be made. There is none since, except as the result of some statute.

Now the liberty of contracting is unlimited except so far as it is affected by R. S., c. 53, § 1. This statute requires that messages should be sent in the order in which they are received, and ' in case of any error or unnecessary delay in writing out, or delivering a dispatch within their delivery limits, making it less valuable to the person interested therein,' the company ' shall be liable for the whole amount paid on such dispatch.' By § 3 the company is made liable for fraud and is not exonerated ' from any liabilities existing at common law for any neglect or wrong-doing of such company or its agents, etc.

Subject to this statute, ' the obligation of the company to use due care and skill in the transmission of the messages, says Lush, J., in *Playford* v. *United Kingdom Telegraphic Co.*, 11 Best & Smith, 759, ' is one entirely arising out of the contract.' The telegraph company may be liable to the party sending to the whole extent of the damages arising from a failure to transmit, unless that liability can in some way be limited or restricted. There is no legal limitation upon the price for sending and that may be graduated according to the greater or lesser risk and according to the damages consequent upon a failure. If the price is too high for a guaranty, the party wishing to send may abstain from sending upon a warrant, or may stipulate for the transmission of the message at a less price for himself, and with a reduced claim for compensation against the operator or company.

The common-law liability will be for the payment of such damages as may be agreed upon in advance, or in case there is no agreement, for all damages naturally and directly resulting from the violated contract. In *McAndrew* v. *Tel. Company*, 84 E. C. L., 12, the defendants had their liability limited by certain rules and regulations, somewhat like those in the case under consideration. The counsel claiming to recover, notwithstanding their rules and regulations, Jervis, C. J., very pertinently asks, ' Do you maintain that

the legislature meant to cast upon the company, for a reward of a few shillings, a liability to the extent of £10,000 or £100,000 ?

No principle of public policy is adverse to these principles.   Indeed the general liberty to contract is the highest policy.   The telegraphic companies may, by express contract or by reasonable rules and regulations made known to those dealing with them, limit their liabilities.

The terms upon which the defendant company offered to transmit messages fully appear in the case.

When these terms are assented to by the signature of the party sending the message, as they were by the plaintiff in the present case, they constitute a contract, which not being at variance with any statute or any of the rules of the common law, is binding upon the party signing the agreement.

That a contract is thus created, and that so far as relates to messages sent by day it is binding, has been settled by the general current of authorities in this country.   In *Breese* v. *U. S. Telegraph Co.*, 45 Barb. 274, it was held that a printed blank like the above, being filled up was a general proposition to the public of the terms and conditions upon which messages would be sent and the company become liable in case of error or accident; and that by writing a message under such heading and signing and delivering it for transmission the sender accepted the proposition, and it became an agreement binding upon the company according to its terms and conditions.   To the same effect are the cases of *The Western Telegraph Company* v. *Carew*, 15 Mich. 524 ; *Camp* v. *Western Union Telegraph Co.*, 1 Met. (Ky.), 164.   One of the conditions of a telegraph company, printed in their blank form, was that they would not be liable for damages if the claim was not presented in sixty days from sending the message.   Held, the condition was binding on one sending the message on the printed form.

On the telegrams were printed these words :  ' Send the following message subject to the above terms, which are agreed to.'   ' The message,' remarks Agnew, J., ' followed immediately, signed with the name of the plaintiff's firm.   This, undoubtedly, amounted to a

True *v.* International Telegraph Company.

written agreement by the plaintiff, to send the message according to the terms.' *Wolf* v. *Western Union Telegraph Co.*, 62 Penn., 83. By this agreement the statute of limitations was restricted to sixty days. If this can be done by the agreement of parties, there would seem to be no doubt that they might agree upon the damages to be paid in case of a breach of the contract. To the same effect is the case of *U. S. Telegraph Co.* v. *Gildersleeve*, 29 Md. 232.

So, too, in England, and in some of the States, telegraph companies are authorized by statute to establish reasonable rules and regulations, and rules and regulations like those of the defendant corporation have received the sanction of the court. In *McAndrew* v. *Telegraph Co.*, 84 E. C. L. 3, the plaintiff sent a message to the defendant's office to be transmitted by the telegraph to a vessel lying off Exmouth, requiring the master to proceed with her to Hull. The message was received by the defendants, subject, among others, to the following conditions: ' The company will not be responsible for mistakes in the transmission of unrepeated messages from whatever cause they may arise.' In the transmission of the message (which was an unrepeated one), ' Southampton ' was by mistake substituted for ' Hull,' in consequence of which the vessel went to the former place, and the plaintiff sustained loss in the sale of the cargo at a bad market. The point was taken that here was gross negligence, but the court unanimously sustained the defense. The rule as to repeating messages was held a reasonable one. ' The public,' observed Crowder, J., ' have thus the opportunity of transmitting unimportant messages for a small charge ; or if it be a matter of importance they may, at a moderate additional charge, have the message repeated, and so obtain a certainty almost of its being transmitted with perfect accuracy. I see nothing unreasonable in that.' The reasonableness of this as a regulation was affirmed in *Ellis* v. *Telegraph Co.*, 13 Allen, 226 ; *Albany & Buffalo Telegraph Co.* v. *DeRulte*, 1 Daly, N. Y. 547. In *U. S. Telegraph Co.* v. *Gildersleeve*, 29 Md. 232, Alvey, J., says ' the appellant had a clear right to protect itself against extraordinary

risk and liability, by such rules and regulations as might be required for the purpose.'

The question of liability before us arises as to the effect of the agreement between the parties as to night messages, limiting the liability of the defendant to the repayment of the amount received.

The defendants were under no obligation to send their messages by night. If for the accommodation of the public, they do it upon terms and conditions neither at variance with common nor statute law, to which the sender accedes, why should he not be bound by his deliberate assent thereto equally in this as in other cases.

The company transmit messages for different rates of compensation, and at different risks in case of failure, however caused. It insures the delivery of the message, at all events, for a premium. It becomes responsible for fifty times the sum received for a repeated message. It sends in the night at a much reduced price, and the sender agrees that the company shall not be liable for mistakes or delays in the transmission or delivery or for non-delivery of any message beyond the sum received. ' The appellee,' remarks Alvey, J., in *U. S. Telegraph Co.* v. *Gildersleeve*, ' by requiring the message to be repeated, could have assured himself of its dispatch and accurate transmission to the other end of the line, if the wires were in working condition; or by special contract for insurance, could have secured himself against all consequences of non-delivery. He did not think proper, however, to adopt such precaution, but chose rather to take the risk of the less expensive terms of sending his message.' So here the sender chose the cheapest mode of transmission, agreed to the damages in case of non-delivery, and now claims to impose upon the corporation the liabilities incurred by a day message on more expensive terms. We perceive no reason why he should not be held to his contract.

The ordinary risks of transmission by telegraph by day, are increased when the message is sent by night. The operator at some station on the line may have left his post; the messenger may be absent; the price paid is less than in the day; the message, it may be presumed, is of minor importance; the greater diligence of the

day is not contracted for; the company says, I will send your message by night or repay you the money received for its transmission; the chance of its transmission is less than by day; my price is less; my interest is to send all messages, for it is my business, but if you choose to send by night, the only risk I will run is that of repayment; I am not compelled to transmit it by night. The sender agrees to this; here is a contract; the consideration is sufficient; it is entered into by parties competent to contract; there is no statute prohibiting; it is a contract for the liquidation of damages, and if there is anything parties can do without let or hindrance, it is to agree in advance upon the damages to be paid in case of a violated contract. Whether the damages thus agreed upon are large or small, is a matter for the contracting parties, and for them alone. If they are satisfied with large or small damages it matters not to any one else.

But in this case the damages agreed upon are precisely those prescribed by R. S., c. 53, § 1. If it be said that the company is not exonerated 'from any liabilities existing at common law,' that does not alter the result. The common-law liabilities are those arising from contract express or implied. Whatever they may be, they may be waived or modified by contract. But arising from contract, the damages may be agreed upon in advance as well as in any other case.

So if these conditions are to be regarded as rules and regulations, it is difficult to see why they are not reasonable and just.

It is said the defendants are common carriers. It is not so. The resemblance is but fanciful. They are not subject to the same legal rules and liabilities as common carriers. *Breese* v. *U. S. Telegraph Co.*, 45 Barb. 271. 'The reasons of policy and expediency on which the rule of the common law is founded which imposes on carriers of goods a liability for all losses not caused by the act of God or the public enemy,' observes Bigelow, C. J., in *Ellis* v. *American Telegraph Co.*, 13 Allen, 226, 'do not apply to the business of transmitting messages by means of the electric telegraph.' So in *The Western Telegraph Co.* v. *Carew*, 15 Mich. 524, it was held that

telegraph companies in the absence of any provision of the statute, are not common carriers, and their obligations and liabilities are not to be measured by the same rules. ' I can find no authority,' observes Hunt, J., in *Leonard* v. *The N. Y. Telegraph Co.*, 41 N. Y. 571, ' and can discover no principle upon which to charge such a company with the absolute liability of a common carrier. That liability was founded upon the necessities of the case, real or fancied, and has never been applied to any person or to any occupation, except those of carriers of goods and innkeepers.' Whether the liability of the telegrapher is based upon the contract he makes or upon his public duty, he does not come within any of the principles applicable to a common carrier.' In *Smithson* v. *U. S. Telegraph Co.*, 29 Md., 167, Nelson, J., in delivering the opinion of the court, says ' The defendants were bailees, not common carriers, and not to be held to the rigid and strict accountability of common carriers,' etc.

To the same effect is an English decision, *Playford* v. *United Kingdom Electric Telegraph Co.*, 11 Best & Smith, 759.

But if they were common carriers, the party sending his message might waive his common-law rights, and might limit the liability of the carrier to an amount as much less than that established by law, as he might deem expedient, as is done in the case of a carrier of goods. ' A public carrier,' observes Bigelow, C. J., in *Judson* v. *Western R. R. Co.*, 6 Allen, 489, ' may enter into a special contract with his employer, by which he may stipulate for a partial or entire exoneration from his liability at common law as an insurer of property committed to his custody, and such contract is not contrary to public policy, or invalid as transcending the just limits of the rights of parties to regulate their dealings by special stipulations. As a necessary corollary of this conclusion, it is also held in the best considered text-writers, that a notice by a carrier that he will not assume the ordinary responsibility imposed on him by law, if brought home to the owner of goods delivered for transportation, and assented to clearly and unequivocally by him, will be binding and obligatory upon him, because it is tantamount to an ex-

press contract, that the goods shall be carried on the terms specified in such notice.' In *Austin* v. *Manchester, &c., Railway Co.*, 70 E. C. L., 453, horses were delivered to a railway company to be subject to a note or ticket containing the following notice: ' This ticket is issued subject to the owner's undertaking to bear all the risk of injury by conveyance and other contingencies, etc., the charges being for the use of the railway carriage and locomotive power only, the company will not be responsible for any alleged defects in their carriages or trucks, unless complaint be made at the time of booking or before the same leave the station; nor for any damages, however caused, to horses, cattle or live-stock of any description traveling upon their railway or in any of their vehicles.' This contract was held valid and binding upon the parties. ' The question,' observes Creswell, J., ' therefore still turns upon the contract, which, in express terms, exempts the company from responsibility from damages, however caused, to horses, etc. In the largest sense, these words might exonerate the company from responsibility, even for damage done willfully, a sense in which it is not contended that they were used in this contract. But giving them the most limited meaning, they must apply to all risks of whatever kind, and however arising, to be encountered in the course of the journey; one of which, undoubtedly, is the risk of a wheel taking fire, owing to a neglect to grease it. Whether that risk is called negligence merely, or gross negligence, or culpable negligence, or whatever other epithet may be applied to it, we think it is within the exemption from responsibility provided by the contract; and that such exemption appearing on the face of the declaration, no cause of action is disclosed, and that judgment must be arrested.'

In *Can* v. *L. & Y. Railway Co.*, 7 Exch., 707, it was decided, that when a railway company had made a contract, in which it was stipulated that they shall not be answerable for any accident, however caused, the contract bound the party, and the company was not answerable for any loss or injury though occasioned by their own negligence. In *Simons* v. *The Great Western Railway Co.*, 86

E. C. L., 805, the conditions were, ' That no claim for damages will be allowed unless made within three days after the delivery of the goods, nor for loss, unless made within three days of the time that they should be delivered,' and ' in the case of goods conveyed at special or mileage rate, the company will not be liable for any loss or damage, however caused,' were held just and reasonable, much more would a mere limitation of damages be held reasonable, especially if assented to. In *Walker* v. *York & Midland Railway Co.*, 75 E. C. L., 750, the defendants printed notices declaring that they would not carry fish except on terms relieving them from all responsibility, and declaring that their servants had no authority to alter these terms. A notice was served on the plaintiff, who notwithstanding sent his fish. ' If a man,' says Wightman, J., ' is told that goods will not be received, except on certain terms, and, notwithstanding this, he will send the goods, I think he must be taken to agree that they shall be taken on those terms.' The verdict for the defendants was not set aside.

The defendants proposed to transmit night messages only on certain terms and conditions. To these the plaintiffs acceded and sent their message to them. Here is a contract between the parties. It is against no statutory provision. It is at variance with no rule of the common law.

After a breach the parties may agree upon any sum as damages. They may equally well do it before. It is incident to the general right to contract, with which no court can interfere, as long as the contract is not prohibited by law. The agreement made is lawful. It is binding. It should be enforced equally as any other case.

It results from these views, that telegraphic companies are not common carriers and not subject to their liabilities.

They may limit their liabilities by express contract, or by rules made known to those dealing with them.

When these terms are assented to by the parties sending the message, they constitute a contract, which if not at variance with the statute or the common law, is binding upon the party signing the same.

The limitation as to damages, that the company is liable only to repay the sum received in case of a failure to deliver a night message is not at variance with the statute nor with any rule of the common law.

The plaintiff having assented and agreed to the same is limited in his damages to the amount paid for the transmission of his message, there being a failure of its delivery.

Damages for the breach of a contract may as well be agreed upon before, as after such breach, and such agreement is binding in each case.

In my judgment, a default should be entered for .forty-eight cents damages.