## THE WESTERN UNION TELEGRAPH COMPANY *vs.* N. LEHMAN & BROTHER.

*Telegraph Companies—Negligence in Delivery of Telegram Ordering Goods—Measure of Damages— When Profits on Re-Sales May Not be Recovered—Stipulation as to Time for Making Claim Against Telegraph Company.*

Plaintiff sent a night message from Baltimore to Chicago which, according to the usual course of business, should have been delivered early the next morning. The office of the addressee was in the same building with an office of the telegraph company, and he asked for telegrams early the next morning, but this message was not delivered to him until one o'clock on that day, which was too late to enable him to carry out the instructions contained in it. In an action against the telegraph company it made no explanation of the cause of the delay in receiving or delivering the telegram. *Held*, that this evidence is legally sufficient to show negligence on the part of the defendant company.

In an action to recover from a telegraph company, the damages resulting from its failure to deliver with due diligence a telegram, it is error to instruct the jury that if they find that the defendant did not use ordinary care, whereby the loss in question arose, "then the plaintiff is entitled to recover to such an extent as the jury shall believe he sustained loss." Such instruction leaves the whole question of damages at large, without any direction as to what elements, and within what limits, the damages may be estimated.

When a telegraph company negligently fails to send or deliver in time a clear and distinct message ordering goods, the sender may recover as damages the loss of profits he would have made on a re-sale, if he had made such re-sale relying on obtaining the goods in pursuance of the telegram. But if no re-sale has been made, the sender cannot recover the profits he might have made from a re-sale if the goods had been received, because such damages are too remote and uncertain.

Plaintiff sent the following telegram to his agent in Chicago: "If reasonable, ship tomorrow, Thursday, four to six loads marketers." On account of the negligence of the telegraph company, the message was not delivered in time to enable the agent to make the purchase and shipment. In an action against the company, plaintiff's evidence showed that marketers were cattle of a certain kind, which could on that day have been purchased at a low rate in Chicago ; that if then shipped, they would have reached plaintiff in Baltimore on Sunday evening or on Monday morning, in time for the Monday market; that plaintiff had regular customers for cattle, and that plaintiff was satisfied that he would have made a profit of five dollars a head on the cattle if they had been received. There was no evidence that plaintiff had made any contracts for the sale of these cattle, and no evidence as to the selling price of such cattle in Baltimore, or as to the market supply and demand on the day when they might have arrived. *Held*, that under these circumstances the plaintiff is not entitled to recover as damages the profits on the possible re-sales since such damages are too contingent, uncertain and speculative.

A telegram was sent under a condition printed on the blank that the company would not be liable in any case where the claim was not presented in writing within thirty days after the message was filed. Within thirty days thereafter, the sender wrote a letter claiming to have been injured by a delay in the delivery of the message and saying that if the company would settle promptly, he would accept one hundred and twenty dollars, but if not, he reserved the right to claim the actual loss sustained, which was much larger than that sum. *Held*, that, assuming the validity of the stipulation, the sender is not precluded from claiming a greater sum after the expiration of the thirty days, since notice of the claim had been given within the time limited.

*Decided June 25th, 1907.*

Appeal from the Superior Court of Baltimore City (ELLIOTT, J.)

The defendant's first and second prayers were as follows:

1st. The defendant prays the Court to instruct the jury that if they should find for the plaintiffs, the measure of damages, is the difference between the market value of cattle of the kind described in evidence, in Chicago at the time when plaintiff's telegram should have been received, and the market price of the same cattle at the time when, with reasonable diligence the agent of plaintiffs in Chicago could have secured the same kind and amount of cattle, and there has been no evidence introduced legally sufficient to prove such difference, and the verdict of the jury must therefore be limited to the amount paid by plaintiffs for the sending of the telegram. (*Refused.*)

2nd. The defendant prays the Court to instruct the jury that there has been no evidence offered legally sufficient to entitle the plaintiffs to recover damages beyond the amount paid for the sending of said telegram. (*Refused.*)

The cause was argued before BRISCOE, BOYD, PEARCE, BURKE and SCHMUCKER, JJ.

*W. Irvine Cross* and *Frederick C. Colston*, for the appellant.

Plaintiffs claim as damages the profits which they assert they would have made if the cattle had been bought and shipped. Defendant claims that while loss of profits can be recovered as damages, the damages here claimed are distinctly speculative damages, the recovery of which Courts have never allowed.

Speculative, as so used, refers to the remoteness of the profits, to the indirectness of their connection with the thing to be done, to the fact that the profits are dependent upon intermediate factors. The principle is best shown by some of the cases in which it has been applied.

In *Western Union Tel. Co.* v. *Hall*, 124 U. S. 444, the following telegram was sent by the plaintiff: "Buy ten thousand

if you think it safe.   Wire me." The telegram related to the purchase of ten thousand barrels of oil and the fact that it was a message of business importance, was fully disclosed upon its face.   Nevertheless the Court granted only nominal damages. Quoting from page 454: "The only theory then on which the plaintiff could show actual damage or loss is *on the supposition that, if he had bought on the 9th of November, he might and would have sold on the 10th.*"

Precisely our case except for the greater remoteness and more numerous contingences in the latter. The Court in this case dwells very strongly on the fact that there was no actual loss to the plaintiffs.   "No transaction was in fact made, and there being neither a purchase nor a sale, there was no actual difference between the sums paid and the sums received in consequence of it, which could be set down in a profit and loss account."   Owing to the delay in the telegram the oil was never bought.   In the case at bar, owing to the delay in the telegram, no cattle were ever bought,   The resemblance in this respect between the two cases is very close.   See also *Fox* v. *Harding*, 7 Cush. 522; *W. U. Tel. Co.* v. *Graham*, 1 Colo. 230; *U. S. Tel. Co.* v. *Gildersleeve*, 29 Md. 232; *Landsberger* v. *Magnetic Tel. Co.*, 32 Barb. 530; *Squire* v. *Tel. Co.*, 98 Mass. 233.

A careful perusal of the decisions in the majority of the States and in the Supreme Court of the United States would seem to show that the Illinois Court in laying down the rule of damages set forth in *Postal Tel. Co.* v. *Lathrop*, 131 Ill. 575, stands alone.   A vast majority of all messages received by a telegraph company plainly relates to business transactions.   To make a company liable for any and all damage which may result from any delay in such messages is certainly a radical departure from all hitherto accepted ideas.   The immense liability which such a rule of damages puts upon a telegraph company is out of all proportion to the amount charged for sending a message.   The message may very plainly relate to business transactions and yet give no clue to the telegraph company of the amount of money involved or of the magni-

tude of the transaction.    Is it fair or equitable to hold a tele-
graph company liable for all damages, however large and how-
ever unexpected, which may flow from a failure to deliver the
telegram, merely because the company could tell from the face
of the message that it related to a mercantile transaction?   Yet
this seems to be the result of the rule laid down by the Illinois
Court.

As to the validity of the clause requiring all claims to be
presented in writing within thirty days.    Such a condition is a
very common one, and can be found on all telegraph blanks.
A similar clause is one of the conditions of the uniform bill of
lading, recently adopted by a majority of the railroads.    The
reason for such a clause is perfectly apparent.    Owing to the
large amount of business passing daily through a telegraph or
railroad office it would often be extremely difficult, if not im-
possible, for the company to make any investigation of a claim
that was not put in promptly.    It would be difficult for the
company to resist unjust claims, and many just claims would
be refused because of the impossibility of gathering any evi-
dence as to them.    Therefore, clauses of this kind are for the
protection of the public as well as the company.    They have
been frequently passed on by the Courts, and, having in mind
the reason for their existence, it may be said that the Courts
have universally upheld them.

The Courts have agreed that such a time limitation does
not tend to limit the liability of the company for its own negli-
gence or that of its agents, and is not unreasonable when time
is given the party to become aware of his injury and to pre-
sent his claim properly.    *Am. & English Encyc.*, vol. 27, page
1046.    Cases in which this particular clause has been passed
upon by the Courts are: *Beaseley* v. *Western Union*, 39 Fed.
181; *Western Union* v. *Dunfield*, 11 Colo. 335; *Cole* v. *Wes-
tern Union*, 33 Minn. 228; *Massengale* v. *Western Union*, 17
Mo. App. 257.

In the consideration of the plaintiffs' first and second prayers,
granted by the Court below, the question is presented as to
the validity and legality of the stipulation in the telegraph

blank as to the repeating of messages.   The stipulation is as follows: "The company will not hold itself for errors or delays in transmission or delivery of unrepeated night messages, sent at reduced rates, beyond a sum equal to ten times the amount paid for transmission."

This stipulation, as well as the stipulation as to presenting claims within thirty days, has often been before the Courts.

The entire weight of authority upholds this stipulation as being reasonable and valid.

Perhaps the leading case on the subject is *Primrose* v. *Western Union*, 154 U. S. 1.   The Court in that case unqualifiedly upheld the stipulation as reasonable and valid.   This ruling was confirmed in *Western Union Telegraph Company* v. *James*, 162 U. S. 650, in the case of a delayed message.   The reasons which lead the Supreme Court to uphold this stipulation are clearly and fully set forth in the *Primrose case*, *supra*.   Other decisions in point are: *McAndrew* v. *Electric Tel. Co.*, 17 C. B. 3; *Baxter* v. *Dominion Tel. Co.*, 37 Upper Canada, Q. B. 476; *Western Union* v. *Coggin*, 68 Fed. 137; *Cox* v. *Western Union*, 130 Cal. 657; *Ellis* v. *American Tel. Co.*, 13 Allen (Mass.) 226; *Bennett* v. *Western Union*, 2 N. Y. Supp. 365; *Parsmon* v. *Western Union*, 78 Pa. St. 246.

This Court seems to take the same view.   *Birney* v. *Tel. Co.*, 18 Md. 358; *U. S. Tel. Co.* v. *Gildersleeve*, 29 Md. 232.

*Wm. Pinkney Whyte* and *Louis B. Bernei*, for the appellees.

The message in controversy was one, relating to a commercial transaction, couched in language plain and intelligible.   The record shows that the plaintiffs had been buying cattle through their agent Hexter at the Chicago stock yards for many years, they communicated by telegraph, using the defendant company's wires for the purpose, the message bore on its face the necessity for prompt transmission and delivery—"Ship tomorrow, Thursday," necessitated, as the company's agents well know, the purchase of the stock during the market hours that day, and the urgency of the dispatch was accentuated by the agent's repeated inquiry for a message that morning.

The case at bar is on all fours with that between the same parties in 105 Md. 442, in which, to use JUDGE PEARCE'S words, "the damages claimed are such as arise naturally, *i. e.*, according to the usual course of things, from the breach of contract, and must be presumed to have been in the contemplation of the parties."

What more natural as a result flowing directly from the failure of the defendant company to promptly deliver the telegram in question, than the loss of the profits on the cattle which would, under the evidence, have been bought in Chicago and sold to customers waiting for them in Baltimore?  See *Postal Tel. Co.* v. *Lathrop*, 131 Ill. 575.

Where a company engaged in the transmission of written messages by telegraph fails to deliver a message seasonably and correctly according to its undertaking, the two facts of the undertaking and the default make out a case of negligence sufficient to charge such company with the payment of damages, unless it produces an explanation sufficient in law, and proves it to the satisfaction of the jury.  *Thompson on Electricity*, sec. 273; *New York, &c., Tel. Co.* v. *Dryburg*, 35 Pa. St. 298; *DeRutte* v. *New York, &c., Tel. Co.*, 1 Daly, 549.

It has been well settled since the decision in *Masterton* v. *The Mayor of Brooklyn*, 7 Hill, 61, that a plaintiff may rightfully recover a loss of profits as a part of the damages for breach of a special contract, but in such a case the profits to be recovered must be such as have accrued and grown out of the contract itself as the direct and immediate result of its fulfillment.  *Western Union Tel. Co.* v. *Hill*, 124 U. S. 444.

Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract, when they can be rendered reasonably certain by evidence, and have natually resulted from the breach.  *White* v. *Muller*, 71 N. Y. 118, 133. See also *Thompson* v. *Tel. Co.*, 64 Wis. 531.

It is well settled in this State that in actions of tort the loss of profits in a trade or business may be recovered, if it be the direct result of the defendant's wrongful act and is proven with sufficient certainty.  *Svea Ins. Co.* v. *Packham*, 92 Md. 464, 479.

Had these cattle been shipped they would have realized a profit of $5 per head or six hundred dollars in the aggregate.

The rule as laid down in the leading American case of *Griffin* v. *Colver*, 16 N. Y. 489, is "that the party injured by a breach of contract is entitled to recover all his damages, *including gains prevented as well as losses sustained* provided they are certain and such as might naturally be expected to follow the breach.

In these and like cases profits are recoverable and recovered in all cases when the market value is greater than the contract price. The party failing to deliver the goods according to agreement has injured the other party, the measure of that injury when the price has not been paid, is fixed by law at the sum which the goods would have brought in the market at the time and place of delivery, less the contract price. *Manville* v. *Western Union Tel. Co.*, 37 Ia. 220.

If there has been a re-sale of the goods effected or agreed upon, whereby a profit would have been realized then this also can be recovered. *Jones on Telegraph and Telephone Cos.*, sec. 549.

BOYD, J., delivered the opinion of the Court.

The appellees sued the appellant for damages alleged to have been sustained by them for its delay in delivering a message sent by them to Chicago. The appellees are dealers in live cattle in Baltimore and a Mr. Hexter had been buying cattle for them in Chicago for a long period of time. On the evening of July 13th, 1904, they sent a night message to Mr. Hexter, whose office was in the exchange building at the Stock Yards in Chicago, which read: "If reasonable ship to-morrow, Thursday, four to six loads marketers." The term "marketers" means cattle such as plaintiffs would want to sell to the retail trade in Baltimore. That term distinguishes the cattle for that trade from those which are to be exported— "marketers" being supposed to weigh about 1,200 pounds and "exporters," as they call them, weighing about 1,400 pounds. They aim to ship twenty head of "marketers" to the

car load. The message should have been delivered early the next morning in time for the opening of the stock market at 8.00 A. M., but Mr. Hexter did not receive it until about one o'clock, P. M., on July 14th. The telegraph company had an office in the same building, and Mr. Hexter testified that "the custom regarding the delivery of night messages by the Western Union at the Union Stock Yards of Chicago is that they are either delivered at the office of the parties to which they are directed, or that the party goes to the Telegraph Company's office for them;" that he inquired at the company's office two or three times that morning regarding such a telegram, and was informed there was none for him; he usually received orders for the purchase of cattle from seven to eight o'clock in the morning; that "In the ordinary course of events, I would have received the telegram mentioned at about 7 o'clock, A. M.," and that it was and had been his custom to go to the office of the company every morning and make inquiries for messages. At the time, there was a strike at Chicago among the butchers, and for that reason cattle could be purchased there at better figures than usual. The record does not state clearly the time the message was received at Chicago, but there is written on the message which Hexter received "10 59 P." which the appellees claim in their brief meant that the telegram was received at 10.59 P. M. However that may be, there was no attempt on the part of the company to explain why it was not delivered earlier, or to show any cause for delay in receiving or delivering the telegram at Chicago.

The expression "if reasonable, ship" meant that Hexter was not to buy unless price was in his judgment reasonable. That referred to the condition of the Chicago market, and one of the plaintiffs testified "the Baltimore end I would look out for." The appellees claim that if Hexter had received the telegram in time, he would have bought the cattle, which would have been shipped on Thursday, the 14th, and if cattle are shipped on Thursday, "they generally get here Sunday; may be Monday morning." At that time Monday was market day in Baltimore. One of the plaintiffs testified that they had a regular

trade which they supplied every market day, and wanted those cattle for that trade. He said "I had plenty of buyers waiting to take every bullock if they came here." The Court told the witness to tell the jury definitely what the plaintiff's loss was, to which he could testify, by reason of the failure of the cattle to arrive, and he replied : "I am satisfied that if I had had these cattle here they would have brought us a profit of $5.00 a head, had they come here for that market day."

There are fifteen bills of exception in the record—fourteen of them presenting rulings on the admissibility of evidence and the fifteenth embracing the prayers, of which the plaintiff's offered two, which were granted, and the defendant seven, all of which were rejected. We will first consider the prayers. The conclusion of the plaintiffs', first is in the language used in their prayer in the case between these parties, decided in April last, 105 Md. 442. After stating the facts relied on by the plaintiffs in the respective cases, the prayers in each concluded: "and if they shall further find that the defendant did not use such ordinary care and diligence in delivering said telegram as is usually used and adopted by prudent business men in like business, and if they shall further find that, by reason of such negligence, the loss in question arose, then the plaintiffs are entitled to recover to such an extent as the jury shall believe from the evidence they sustained loss." In the former case we quoted from *B. & O. R. R.* v. *Carr*, 71 Md. 143, what Judge Alvey said, in delivering the opinion of the Court, in reference to a similar instruction which in part was: "This left the whole question of damages at large, without definition by the Court, to the discretion of the jury, and without any criterion to guide them. * * * The Court must decide and instruct the jury, in respect to what elements, and within what limits, damages may be estimated in the particular action." We held in the other case that we could not approve of that prayer, and it should not have been granted, but inasmuch as the jury found a verdict for the precise sum testified to as the actual loss sustained, the defendant was not injured, and hence, under our well established rule, there being no injury there was no reversible error.

In that case the plaintiffs had contracted for space for 505 cattle to be shipped on a steamer which was to leave Baltimore November 14th, 1903. Under an arrangement with the steamship company the plaintiffs were notified, about a week before the steamer was to leave, of the day it would leave, and a day or two before that the company would again notify them when to have the cattle alongside the vessel. They were notified on November 7th that the steamer would leave on the 14th instant. The plaintiffs had purchased, through their agents in Tazewell, Va., 331 head of cattle, which they directed their agents to ship to Baltimore on November 11th, in order to make up that shipment, and also instructed them to telegraph them when the shipment was made. On that day those cattle were shipped and their agents sent a telegram the same afternoon saying: "Shipped cattle today." The telegram was received in Baltimore by the telegraph company at 9:30 P. M. on the 11th, at its office only two blocks from the residence of the plaintiffs, but was not delivered until 3 o'clock of the afternoon of the 12th. Not receiving any telegram on the night of the 11th, or the morning of the 12th, the plaintiffs, to insure the loading of the steamer, as they had to pay for the space whether they used it or not, telegraphed to other points for the shipment of 171 cattle which they had in Virginia and which they intended for shipment by a later steamer. On the 13th the 331 cattle shipped from Tazewell arrived in Baltimore, the consequence being that the plaintiffs had on hand in Baltimore 164 head of cattle for which there was no space in the steamer. That was on Friday and there was no opportunity for them to dispose of them in Baltimore before Monday, which was the next market day there. As there was a market on Saturday in Philadelphia the plaintiffs immediately shipped them there and sold them on Saturday—one of the plaintiffs going with them and personally attending to the sale. According to the evidence there was a loss of $4.43 a head on the 164 cattle, aggregating $726.52, which was the amount of the verdict. Under the circumstances of that case we were of the opinion that the plaintiffs were entitled

to recover for the loss they had sustained, by reason of the negligence of the defendant in not delivering the telegram more promptly.    There was undoubted negligence and it resulted in the plaintiffs having 164 cattle in Baltimore which they could not dispose of there.    In order to avoid unnecessary loss, it was not only the right but the duty of the plaintiffs to do what they reasonably could to that end.    It was not shown that it was not reasonable and wise to pursue the course they did, and inasmuch as they had offered evidence tending to prove their actual loss, and the verdict of the jury corresponded to the cent with that proof, we did not feel justified in disturbing the judgment, by reason of the error in the prayer.

But in this case there was no such definite evidence of damages, which the plaintiffs were entitled to recover, as would justify us in refusing to reverse for an error committed, on the ground that there was no injury done by that error.    The verdict it is true was only for $450, but how that was reached, no one can tell from the record.    The injury complained of was not from having so many cattle on hand, by reason of the negligence of the appellant, that the appellees could not dispose of them in Baltimore, and hence sought another market where they met with loss in the sale of them, as it was in the other case.    No money had been expended by the appellees and no cattle were purchased at a greater price than they could have been gotten for, if the telegram had been delivered within a reasonable time, for none were purchased at all in consequence of the telegram.    The evidence as to the appellee's loss of profits was altogether indefinite and uncertain (even conceding that to be a proper element, which we will consider later).    In the first place it was not clearly shown whether Hexter, the agent in Chicago, would have purchased *four* or *six* carloads.    The telegram left that to his discretion, and while he did answer, "Yes," to the question: "Had you received this telegram, when, as you state, you should have received it, would you have bought the cattle called for by it  *  *?" he did not say how many he would or could have bought and "the cattle called for" were "four to six loads."

But there is very little in the record to show that the appellees really lost any profits by not having these cattle on that market day. We have stated above what the evidence was on that subject, but even if it be conceded that they might have made $5 a head profit on those particular cattle, if they had been in Baltimore on that day, it is not shown that they did not get other cattle, and supply their customers, on which they made that or some other profit. The testimony was that the appellees had "a regular line of customers to sell cattle to on the Baltimore market," and presumably if they were unable to furnish their customers with cattle wanted by them, that fact would have been distinctly proven. It is not pretended that these cattle had been sold to the customers when ordered or afterwards. Regardless of other reasons, we are of the opinion that there was reversible error in granting the plaintiff's first prayer, as there was in granting the second, which concluded in the same general terms, by reason of the jury not being properly instructed as to the damages.

But in addition to that, were the plaintiffs entitled to recover for the loss of profits, under the circumstances of this case? We have already pointed out the marked distinction between the facts in the two cases, and hence the decision in the prior case is not conclusive of this, on the question of damages. In the absence of some valid restriction in the contract, there can be no doubt that a telegraph company may be held liable for loss of profits by reason of its negligence in not delivering a message within a reasonable time—provided the message be not in cipher, or otherwise unintelligible, except to the sender and addressee. In addition to the authorities referred to in the previous case many others might be mentioned. In 27 *Am. & Eng. Ency. of Law*, 1059–1067, the subject is discussed and many cases are cited. In the case of the *Western Union Telegraph Company* v. *Hall*, 124 U. S. 444, the doctrine is recognized, as indeed it is in *Gildersleeve's case*, 29 Md. 232. But the further question is, for what *kind of profits* can there be a recovery? The rule is thus stated in 27 *Ency. of Law*, 1067, "When the telegraph company wholly

fails to transmit or deliver a message ordering goods, the measure of damages is the difference between the price which was due under that order and that which the plaintiff was or would be obliged to pay at the same place in order, by due diligence, after knowing of the company's failure, to purchase a like quality and quantity of goods; *but he is not entitled to recover profits which he expected and might have realized from a re-sale not then effected or agreed upon.* The same rule obtains where there was a mere delay in the delivery." There is no conflict between that statement and what was decided in · the other case. That decision was within the reasoning of such cases as *U. S. Tel.* v. *Wenger,* 55 Pa. 262; *Squire* v. *West. Union Tel. Co.,* 98 Mass. 232; *True* v. *In. Tel. Co.,* 60 Me. 9; *Manville* v. *West. Union Tel. Co.,* 37 Iowa, 214, and *Thompson* v. *Same,* 64 Wis. 531, which are cited in *West. Union Tel. Co.* v. *Hall, supra.* Nor do we understand the case of *Postal Tel. Co.* v. *Lathrop,* 131 Ill. 575, to be in conflict with them on this subject. Many of them are therein cited with apparent approval.

The question here is not whether *any* profits can be recovered in a suit against a telegraph company for negligently delaying the delivery of a message, but whether *such* profits as those claimed can be. If the appellees had sold these cattle, relying on their delivery in pursuance of the telegram, at an advanced price, they could have recovered such profits (unless prevented by some valid restriction in the contract)—just as we held in the other case they could recover for actual losses, as they were such damages as were within the meaning of the rule laid down in *Hadley* v. *Baxendale,* 9 Exch. 341, as construed in *Webster* v. *Woolford,* 81 Md. 331. But the profits claimed in this case are too contingent, uncertain and speculative to permit of a recovery. In addition to what we have said before, if Hexter had purchased the cattle and shipped them, there is no certainty that they would have reached Baltimore in time for the market, on the following Monday. Instead of a profit the appellees might have sustained a loss by reason of not receiving them in time. But if they had reached Balti-

more by Monday, the question whether or not they could have been sold at a profit, or if so at what profit, was altogether contingent and uncertain. It may be conceded that Mr. Abraham Lehman was perfectly honest when he said: "*I am satisfied* that if I had had these cattle here they would have brought us a profit of $5.00 a head had they come here for that market day," but there must be something more definite than a party to a suit being *satisfied* as to what profit he would have made out of the transaction. It was impossible for him to know that such profit would have been made, and evidently the jury did not accept his figures as he was claiming $5.00 a head on 120 cattle. It was not even shown what such cattle were selling for in Baltimore on that Monday, and it is possible that there might have been more in the market that could have been disposed of to advantage, if those ordered by the appellees had arrived. The appellees cited *Svea Ass. Co.* v. *Packham*, 92 Md. 479, where it was said "It is well settled in this State that in actions of tort the loss of profits in a trade or business may be recovered if it be the direct result of the defendant's wrongful act and it is proven with sufficient certainty." There is no doubt about that, but it must be "*proven with sufficient certainty.*" In the cases referred to in that opinion the loss of profits was to the business of the plaintiffs, and was allowed because the profits were definitely proven, and those were such actions as they could be recovered in, upon proper allegations in the declarations. In this case they were not even claimed in the *nar.*, but if they had been they were altogether too uncertain and speculative to permit of a recovery.

Having reached that conclusion we are of the opinion that, *as the case was presented*, the plaintiffs' two prayers should have been rejected, and the first and second of the defendant ought to have been granted. As the fourth and sixth asked the Court to declare that there was no evidence offered legally sufficient to show negligence, they were properly rejected, as there was, in our judgment, ample evidence of negligence. The third and fifth were not neccessary if the second had been

granted and the conclusion of the third is in conflict with that in the other prayers. The seventh was properly rejected. That prayer was based on the stipulation which is printed on the blanks used by the appellant, that the company will not hold itself liable "in any case when the claim is not presented in writing within thirty days after the message is filed with the company for transmission." A statement dated October 12th, 1904, was offered in evidence by the appellees—showing the grounds upon which the claim was made and charging for 120 head of cattle at $5.00 per head, aggregating $600. That being presented more than thirty days after the message was filed, it is contended that the plaintiffs could not recover more than $120 which is the amount set forth in the original claim filed by the plaintiffs, which was dated July 20th. The latter was a letter addressed to the company in which the plaintiff stated fully the facts concerning the sending of the message, when it was delivered and how they claimed to be injured by the delay. In it they said that if the company would promptly settle they were willing to accept the regular commission which was charged at New York, Philadelphia and Baltimore—"that is one dollar per head or in round figures, $120.00 as this class of cattle come not less than 20 head to the carload. We want it understood however, that in case you do not settle promptly as above we reserve the privilege to claim the actual loss sustained by us which owing to the strike amounts to *several dollars* per head, as cattle sold very high in the eastern market about that time." Conceding that such a stipulation is valid when the message is not between points at so great a distance as to make the time named unreasonable, (and the weight of authority would seem to sustain its validity, 27 *Ency. of Law* 1046), we are of the opinion that it should not receive such a construction as is contended for in this case. As is said in a note to that page of the *Ency. of Law*, "It does not operate as a limitation of the time within which suit may be brought, but *is designed merely to give the company notice of the claim in order that it may be investigated promptly.*" By the letter of July 20th (which was within the thirty days) the plain-

tiffs made their claim for compensation by reason of the delay, and merely because they *then* only demanded $120, if a prompt settlement was made, they should not be prevented from subsequently demanding what they claimed to be their actual loss. Especially should this be so when, as in that letter, they notified the company that if it did not settle promptly, they reserved the privilege to claim the actual loss sustained which they said amounted to "several dollars per head." It would not be within the reason of the stipulation, as construed by Courts sustaining it, to hold that the sender of a message was confined to the amount originally claimed, and could not afterwards demand a larger sum, unless perhaps the amount first claimed was so insignificant as to cause the company not to investigate the claim. See *Jones on Tel. & Tel. Co.*, sec. 395.

It was also contended at the argument that the stipulation in the blanks of the company that it should not be liable "for errors or delays in transmission or delivery of unrepeated night messages, sent at reduced rates, beyond a sum equal to ten times the amount paid for transmission" is a valid one. But that question was not only not raised by any prayer of the defendant, but its prayers which were offered proceeded on entirely different theories. Its first prayer, which we have said ought to have been granted as the record stood, asks the Court to instruct the jury as to the measure of damages in a way that is utterly in conflict with this contention. As we have already said the plaintiff's prayers were defective for the reasons stated, we do not deem it necessary to pass upon the validity of this stipulation as there was no prayer offered on the subject and it does not appear to have been in any way raised. If it be held valid, then the conclusions of the defendant's first and second prayers were wrong, and when we said above that they should have been granted, we assumed that this point was not raised, or insisted upon before the lower Court.

And in view of what we have said in considering the prayers, it would serve no good purpose to discuss the fourteen bills

of exception presenting the rulings on the testimony.    For
reasons given we must reverse the judgment.

>                    *Judgment reversed and new trial
>                    awarded, the appellees to pay the
>                    costs.*